# United States Court of Appeals
## For the First Circuit

No. 12-2171

SINDICATO PUERTORRIQUEÑO DE TRABAJADORES, SEIU LOCAL 1996, UNIÓN GENERAL DE TRABAJADORES DE PUERTO RICO, SEIU LOCAL 1199; SERVICE EMPLOYEES INTERNATIONAL UNION; ALIANZA SEIU PUERTO RICO, INC.,

Plaintiffs, Appellants,

v.

LUIS FORTUÑO, in his official capacity as Governor of the Commonwealth of Puerto Rico; PUBLIC SERVICE COMMISSION OF PUERTO RICO; LAUDELINO F. MULERO CLAS, in his official capacity as President of the Public Service Commission; OFFICE OF THE ELECTORAL COMPTROLLER; MANUEL A. TORRES NIEVES, in his official capacity as Electoral Comptroller,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

---

Before

Torruella, Lipez, and Howard,
Circuit Judges.

---

Jeremiah A. Collins, with whom Mark Schneider, Alvin Velazquez, John M. West, Kimberly M. Sánchez Ocasio, Nora Vargas Acosta and Manuel A. Rodríguez Banchs were on brief, for appellants.

Claudio Aliff-Ortiz, with whom Eliezer Aldarondo-Ortiz, Michael C. McCall, and Eliezer A. Aldarondo-López were on brief, for appellees Public Service Commission of Puerto Rico, Luis G. Fortuño-Burset and Laudelino F. Mulero-Clas, and with whom Carlos Enrique Cardona-Fernández was on brief, for appellees Office of the Electoral Comptroller and Manuel Torres-Nieves.

October 19, 2012

**Per Curiam**. In this appeal from the denial of a preliminary injunction, plaintiff labor unions claim that Sections 6.007-.010 of Law 222, Puerto Rico's campaign finance law, place an unconstitutional burden on the unions' First Amendment right to engage in political speech. Despite the gravity of plaintiffs' claims and months of procedural wrangling, including two writs of mandamus from this court to the district court directing it to rule on plaintiffs' motion for preliminary injunctive relief and the merits of their constitutional claims, both the district court and the government declined to address the merits of their claims. Indeed, we asked the Puerto Rico government three times at oral argument to defend the merits of the campaign finance provisions at issue, and each time the government declined to do so. In the absence of any such defense, and in light of the other factors relevant to the preliminary injunction analysis, we issued an appellate injunction on October 11, 2012, enjoining enforcement of the challenged provisions of Law 222 pending the final disposition of this appeal. We now resolve that appeal. In so doing, we explain more fully the reasons why we ordered the entry of the appellate injunction. We also set forth at the end of the opinion the preliminary injunction that we now direct the district court to enter.

## I. Background

Prior to 2011, the rights of labor unions in Puerto Rico to make political expenditures or engage in electioneering were strictly limited by Section 4.7(c)(4) of the Puerto Rico Public Service Labor Relations Act, P.R. Laws Ann. tit. 3, § 1451i(c)(4), also known as Law 45. Seeking to bring Puerto Rico's campaign finance law into compliance with the Supreme Court's landmark opinion in Citizens United v. Federal Election Comm'n, 130 S. Ct. 876 (2010), Puerto Rico enacted the "Puerto Rico Political Campaign Financing Oversight Act," P.R. Laws Ann. tit. 16, also known as Law 222, on November 18, 2011.

Plaintiffs challenge the constitutionality of Sections 6.007-.010 of Law 222. These sections outline the procedures that juridical persons such as corporations and unions must follow if they wish to make either campaign contributions or independent expenditures.[1] Failure to comply with these procedures can result in significant financial penalties, including criminal penalties,

---

[1] Under Law 222, juridical persons can make financial contributions in support of a candidate for political office either through direct contributions or independent expenditures. Direct contributions are those made directly to a political candidate or to a party or committee that coordinates with that candidate's campaign. Independent expenditures are financial investments in electioneering activity outside of a candidate's official campaign. Puerto Rico's campaign finance regulations define "independent expenditure or uncoordinated expenditure" as "an expenditure that is not or was not made in concert with or at the request or suggestion of a political party, aspirant, candidate, or campaign committee, authorized agent, representative, or committee of any of the above." Regulation No. 16, § 3.1.

for the juridical person and its officers.  Because we deem this to be a facial challenge to an intricate statutory framework, we have included the full text of each of the challenged sections in an Appendix attached to this opinion.[2]

The plaintiffs in this case are three labor unions and one non-profit organization associated with the unions.  Plaintiff unions Sindicato Puertorriqueño de Trabajadores ("SPT") and Unión General de Trabajadores ("UGT") together have more than 26,000 members in Puerto Rico.  Both SPT and UGT are affiliates of the Service Employees International Union ("SEIU"), an international labor organization with over 2.1 million members.  Allianza SEIU is a non-profit organization that provides educational and political support to organizations in Puerto Rico affiliated with SEIU.

Officers from both UGT and SPT testified at the preliminary injunction hearing that immediately after Law 222 was passed the two unions swiftly initiated plans to engage in political speech.  On November 19, 2011 -- the day after Law 222 was signed into law -- the unions jointly adopted a platform

---

[2] We note that the text of Law 222 has been amended in part by Law 135, which came into effect on July 3, 2012, two days after the plaintiffs filed their complaint in this case. An official translation of Law 135 is not yet available.  Though an unofficial translation is necessarily somewhat imprecise, we have reviewed plaintiffs' certified translation of Law 135, and conclude that Law 135 makes no substantive changes to the provisions of Law 222 at issue here.  Thus, while we rely on the official translation of Law 222 in our opinion, our holding should be construed to apply with equal force to Law 222 as amended by Law 135.

titled "Proposals for a Better Country" ("the Proposals"), which the unions' membership determined "should be implemented as a solution to the crisis that Puerto Rico is experiencing." The district court described the Proposals as "proposals to improve the lives of their members and their families as well as the welfare of Puerto Rico through the topics of education, health and welfare, labor rights, sustainable development, democracy and citizen participation, and human rights."[3]

After adopting the Proposals, the unions submitted them to different members of the legislature and candidates for political office to see if they would be willing to support the Proposals. On March 30, 2012, UGT's Council of Delegates determined that if permitted by law, UGT would make expenditures on behalf of candidates in the November 6, 2012 general election who supported the Proposals. On June 15, 2012, the SPT Consultative Board adopted a similar resolution stating that if permitted by law, it would make expenditures on behalf of supportive candidates in the general election.

Officers from both unions testified that they had been cautioned by their attorneys that they would face serious risks of liability under Law 222 if they made any political expenditures related to the upcoming general election. Consequently, at the

---

[3] We have not been provided with an English translation of the Proposals.

time the complaint in this case was filed, the unions had not yet engaged in any activities covered by Law 222, such as making political contributions or establishing a political action committee ("PAC"). However, according to testimony of SPT's president Roberto Pagán Rodríguez, SPT had already spent between $15,000 and $20,000 by late September 2012 promoting the Proposals themselves. Most of this money was spent holding meetings across Puerto Rico for union members to discuss the Proposals and printing information about the Proposals for the unions to use internally and at these meetings.

On July 3, 2012, the plaintiffs filed a complaint in the federal district court in Puerto Rico alleging that Sections 6.007, 6.009 and 6.010 of Law 222 restricted core political speech in violation of the First Amendment. On July 17, the plaintiffs moved for a preliminary injunction, seeking to enjoin enforcement of Section 4(c)(7) of Law 45 and of Sections 6.007 through 6.010 of Law 222 "insofar as those provisions violate the constitutional rights of the Unions to make contributions and expenditures in connection with elections to public office and referenda."[4]

---

[4] The plaintiffs have not always been precise in identifying the scope of the relief they seek. As discussed in more detail infra, the substance of the plaintiffs' argument on the merits concerns primarily Section 6.010 of Law 222, and its relationship to other provisions of Law 222 challenged here. Indeed, plaintiffs did not raise any challenges to the prior campaign finance law, Law 45, before us.

Even though the November 6, 2012 general election was rapidly approaching, the district court moved slowly on plaintiffs' motion, and plaintiffs consequently petitioned this court twice for extraordinary relief. In the first instance, without conducting a hearing, the district court issued a sua sponte order on September 7, 2012 certifying the question of Law 222's constitutionality to the Puerto Rico Supreme Court. Plaintiffs petitioned this court for relief. On September 17, we concluded that because the district court had certified only questions of federal constitutional law, certification to the Puerto Rico Supreme Court was inappropriate. Exercising our supervisory mandamus authority, we vacated the district court's certification order, directed the district court to rescind the certified questions, and ordered the district court to "promptly rule on [plaintiffs'] motion for preliminary injunctive relief."

One week later, plaintiffs again petitioned this court for a writ of mandamus. This time, plaintiffs sought to vacate an order of the district court that, in effect, required plaintiffs to produce voluminous documents with only eighteen hours' notice. The district court had granted the defendants' discovery motion and stated that if plaintiffs failed to comply their claim would be dismissed with prejudice. On September 24, 2012, we granted plaintiffs' request for mandamus relief, concluding that "our prior order leaves no room for avoidance through procedural

maneuvering designed to defeat a decision on the merits." We vacated the district court's discovery order in part, and again ordered the district court to rule on the merits of plaintiffs' motion.

The day after our order issued, the district court conducted an evidentiary hearing. On September 27, 2012, the court issued an order denying plaintiffs' request for a preliminary injunction. Plaintiffs quickly appealed and filed a motion for an appellate injunction pending appeal. We set an expedited briefing schedule and heard oral arguments during a special session of this court on October 11, 2012. Within hours of hearing oral argument, we issued a brief order granting plaintiffs' motion for an appellate injunction enjoining enforcement of Sections 6.007-10 of Law 222 pending the disposition of this appeal.

## II. The District Court's Opinion

In its Opinion & Order denying the plaintiffs' motion for a preliminary injunction, the district court framed its analysis using the familiar four-part test for evaluating the propriety of issuing a preliminary injunction. Relying heavily on our opinion in Respect Maine PAC v. McKee, 622 F.3d 13 (1st Cir. 2010), the district court concluded that the plaintiffs had not made a showing of irreparable harm, that the balance of equities favored the government, and that the public interest weighed in

-9-

favor of denying the motion for a preliminary injunction. However, the court declined to determine whether plaintiffs had shown a likelihood of success on the merits, despite the fact that we have repeatedly held that this factor is "the most important part of the preliminary injunction assessment." Jean v. Mass. State Police, 492 F.3d 24, 27 (1st Cir. 2008).

Though it concluded that the balance of the equities favored the government, the district court offered little explanation of what harm the public would suffer if plaintiffs' motion were granted. Without pointing to any specific provisions of Law 222, the district court concluded that "[g]ranting the plaintiffs the emergency relief they now seek in effect leaves the government without the tools to implement its informational interest and thereby maintain an informed electorate." The court then referred to unspecified "disruptions" that would result if it were to grant plaintiffs' motion.

The district court also concluded that plaintiffs had not demonstrated irreparable harm because they "waited until the eleventh hour to seek injunctive relief" and because "the Plaintiffs have not presented this Court with evidence of specific plans to make expenditures to support candidates or political parties or ideologies in furtherance of [the Proposals]." For reasons described in greater detail below, we conclude that the plaintiffs have not engaged in undue delay and have made a

-10-

sufficient showing that they will suffer an irreparable injury to their First Amendment rights if the enforcement of the relevant sections of Law 222 is not enjoined.

### III. Threshold Issues

Defendants argue that the complaint should be dismissed because of lack of standing, justiciability, and ripeness. At times these threshold arguments merge into a challenge to the irreparable injury component of the preliminary injunction analysis. Generally, defendants maintain that plaintiffs "have not taken critical steps needed for them to be able to exercise the First Amendment rights that they claim." Defendants claim that plaintiffs have "fail[ed] to create political action committees, identify and agree on candidates for political parties who would support their [Proposals], make political contributions or expenditures in support thereof, or even make a work plan for such contributions or expenditures."

These arguments reduce to the proposition that there is not a live controversy before the court sufficient to create jurisdiction under Article III. Even though the district court did not address this threshold issue, "we bear an independent obligation to assure ourselves that jurisdiction is proper before proceeding to the merits." Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 324 (2008). Although defendants attach a number of labels to their challenge, we believe that

-11-

their argument is properly construed as an attack on the ripeness of plaintiffs' claims, and therefore analyze it as such.

"The doctrine of ripeness has roots in both the Article III case or controversy requirement and in prudential considerations." Manqual v. Rotger-Sabat, 317 F.3d 45, 59 (1st Cir. 2003). The determination of ripeness depends on two factors: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 53-54 (1st Cir. 1999).

The inquiry as to the fitness of the issues for judicial resolution itself involves both constitutional and prudential components. "The constitutional inquiry, grounded in the prohibition against advisory opinions, is one of timing." Manqual, 317 F.3d at 59. "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . ." Abbott Labs., 387 U.S. at 148. The prudential inquiry is "whether resolution of the dispute should be postponed in the name of 'judicial restraint from unnecessary decision of constitutional issues'; if elements of the case are uncertain, delay may see the dissipation of the legal dispute without need for decision."

Mangual, 317 F.3d at 59 (quoting Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 138 (1974)).

The inquiry into the hardship to the parties of withholding court consideration is "wholly prudential." Mangual, 317 F.3d at 59. The hardship element requires a court to consider "whether the challenged action 'creates a direct and immediate dilemma for the parties.'" Verizon New Eng., Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322, 651 F.3d 176, 188 (1st Cir. 2011) (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995)). Generally, a "mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." Simmonds v. INS, 326 F.3d 351, 360 (2d Cir. 2003). However, the Supreme Court has made clear that when a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (quoting Doe v. Bolton, 410 U.S. 179, 188 (1973)).

As a supplement to these universally applicable aspects of ripeness jurisprudence, we have previously said that "when free speech is at issue, concerns over chilling effect call for a relaxation of ripeness requirements." Sullivan v. City of

-13-

Augusta, 511 F.3d 16, 31 (1st Cir. 2007); see also El Día, Inc. v. Hernández Colón, 963 F.2d 488, 495-96 (1st Cir. 1992) ("A facial challenge of this sort, implicating First Amendment values, customarily works a relaxation of the ripeness criteria."). Such a relaxation has been justified by the potential for "irretrievable loss" often involved in cases where First Amendment rights are at stake. Sullivan, 511 F.3d at 31 (quoting El Día, 963 F.3d at 496); see also Peachlum v. City of York, 333 F.3d 429, 434-35 (3d Cir. 2003) ("The courts have repeatedly shown solicitude for First Amendment claims because of concern that, even in the absence of a fully concrete dispute, unconstitutional statutes . . . tend to chill protected expression among those who forbear speaking because of the law's very existence."). "Thus, when First Amendment claims are presented, '[r]easonable predictability of enforcement or threats of enforcement, without more, have sometimes been enough to ripen a claim.'" Sullivan, 511 F.3d at 31 (quoting New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995)).

Despite defendants' attempts to graft additional requirements that we have never imposed onto the established standards for determining ripeness in First Amendment cases, plaintiffs have done enough to show a "reasonable predictability of enforcement" sufficient to satisfy the relaxed ripeness

-14-

standard applicable to the present case.[5]   A party need not marshal all its resources and march to the line of illegality to challenge a statute on First Amendment grounds.  Plaintiffs have averred that they intend to act in a way that would violate Law 222, and they have taken steps in preparation to carry out those acts.   Furthermore, they have produced evidence that they submitted the Proposals to members of the legislature, and SPT's president testified that UGT has already spent significant funds promoting the Proposals to its members.  In the present case, that is all that is needed to make plaintiffs' claim ripe for resolution.[6]

---

[5] We note that this result would be the same if we were to consider defendants' jurisdictional arguments under the standing doctrine. See Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975) ("The standing question thus bears close affinity to questions of ripeness - whether the harm asserted has matured sufficiently to warrant judicial intervention . . . ."); McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 69 (1st Cir. 2003) ("In general, standing and ripeness inquiries overlap. . . . The overlap is most apparent in cases that deny standing because an anticipated injury is too remote . . . ."); Daggett v. Comm'n on Governmental Ethics and Election Practices, 205 F.3d 445, 463 (1st Cir. 2000).

[6] Defendants also maintain that plaintiffs have not taken advantage of the procedure set out in Section 3.003(e) of Law 222, which provides that a party may request an opinion from the Election Comptroller as to the scope and application of the statute.   However, nowhere in Section 3.003 is the Election Comptroller given the authority to nullify unconstitutional provisions of Law 222. Because it is clear that Law 222 applies to the labor unions (a point that defendants conceded at oral argument), and because the provisions of Law 222 plaintiffs challenge are so constitutionally suspect, see infra, any administrative relief that the Election Comptroller could have provided would have been inadequate.  Plaintiffs were therefore under no obligation to exhaust such remedies.   See Coit

-15-

## IV. The Preliminary Injunction Analysis

"On appeal, we review the grant or denial of a preliminary injunction for abuse of discretion." United States v. Weikert, 504 F.3d 1, 6 (1st Cir. 2007). "Under that rubric, findings of fact are reviewed for clear error and issues of law are reviewed de novo." Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005).

In considering a plaintiff's motion for a preliminary injunction, the district court weighs four factors: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs and (4) the effect, if any, on the public interest." Jean, 492 F.3d at 26-27. Though each factor is important, we keep in mind that "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). To demonstrate likelihood of

---

Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp, 489 U.S. 561, 587 (1989) ("Administrative remedies that are inadequate need not be exhausted."); Sousa v. INS, 226 F.3d 28, 32 (1st Cir. 2000) (no exhaustion requirement "where a resort to the agency would be futile because the challenge is one that the agency has no power to resolve in the applicant's favor").

-16-

success on the merits, plaintiffs must show "more than mere possibility" of success - rather, they must establish a "strong likelihood" that they will ultimately prevail. Respect Maine PAC, 622 F.3d at 15 (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 21 (2008)).

## A. The Obligation To Address the Plaintiffs' Likelihood of Success on the Merits

The district court declined to address the plaintiffs' likelihood of success on the merits of their First Amendment claims, stating that the remaining three factors of the standard weighed against the grant of equitable relief. Defendants urge us to adopt a similar course of action.

This we cannot do. In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis. As the Supreme Court has explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Asociación de Educación Privada de Puerto Rico, Inc. v. García-Padilla, 490 F.3d 1, 21 (1st Cir. 2007) (applying Elrod to irreparable harm component of permanent injunction analysis); Maceira v. Pagan, 649 F.2d 8, 18 (1st Cir. 1981) ("It is well established that the loss of first amendment freedoms constitutes irreparable injury."). Accordingly, irreparable injury is

-17-

presumed upon a determination that the movants are likely to prevail on their First Amendment claim.

It was therefore incumbent upon the district court to engage with the merits before moving on to the remaining prongs of its analysis.  The court's stated reason for not doing so was that addressing the merits was inappropriate on an "incomplete record," and that "engag[ing] in the in-depth analysis required" further factual development.  To the contrary, a facial challenge to a statute presents a question of law that the district court could and should have resolved on the present record.  See New Eng. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 19 (1st Cir. 2002) (stating that facial challenge to regulation presents "pure question of law"); see also Ctr. for Individual Freedom v. Carmouche, 449 F.3d 655, 662 (5th Cir. 2006) (stating that "facial challenge to the constitutionality of a statute presents a pure question of law").

## B.  Likelihood of Success

### 1. Standard of Review

Despite its refusal to consider the merits, the district court stated that the plaintiffs' challenge to Law 222 should be analyzed, in whole or in part, under the "exacting" scrutiny standard applicable to disclaimer and disclosure requirements. See Citizens United, 130 S. Ct. at 914; see also Daggett, 205 F.3d at 454 (applying exacting scrutiny to limits on direct

-18-

contributions).[7]   Plaintiffs disagree, contending that strict scrutiny governs their claims.

Laws that burden political speech ordinarily are subject to strict scrutiny, requiring the government to prove that any restriction "'furthers a compelling interest and is narrowly tailored to achieve that interest.'"  Citizens United, 130 S. Ct. at 898 (quoting Fed. Elect. Comm'n v. Wisc. Right To Life, Inc., 551 U.S. 449, 464 (2007)).   The Supreme Court applied that standard to the regulation at issue in Citizens United, which restricted the ability of corporations and unions to make independent expenditures in connection with political campaigns. After rejecting any distinction between natural persons and corporate persons under the First Amendment, id. at 904, the Court noted that "[t]he purpose and effect of th[e challenged] law is to prevent corporations, including small and nonprofit corporations, from presenting both facts and opinions to the public."  Id. at 907.  The Court observed:

> When Government seeks to use its full power,
> including the criminal law, to command where
> a person may get his or her information or
> what distrusted source he or she may not hear,

_____

[7] Although the basis for the district court's conclusion is not clear, it appeared to believe that the unions' challenge encompassed an attack on Law 222's disclaimer and disclosure requirements.  In fact, plaintiffs asserted no challenge to Law 222's disclosure-related requirements before the district court, and reiterate this position on appeal.  Those requirements are therefore irrelevant, and the district court erred in relying on them in its discussion of the appropriate standard of review.

it uses censorship to control thought.  This
is unlawful.  The First Amendment confirms the
freedom to think for ourselves.

Id. at 908.  The law therefore struck at the heart of core First

Amendment protections and could not withstand strict scrutiny.

The Court explained, however, that not all laws

purporting to regulate election-related spending are treated

similarly.  In certain circumstances, regulations designed "to

ensure against the reality or appearance of corruption," such as

those capping direct contributions to political candidates or

those imposing disclosure requirements on donors, are subject to

the more lenient "exacting scrutiny" review.  Id. at 908; see also

Buckley v. Valeo, 424 U.S. 1, 26-29 (1976).[8]  While disclosure

requirements, for example, similarly "burden the ability to

speak," Citizens United, 130 S. Ct. at 914, they "impose no

ceiling on campaign related activities and do not prevent anyone

from speaking."  Id. (citations omitted) (internal quotation marks

omitted).  Caps on direct contributions, for their part, are

justified by their "limited effect upon First Amendment freedoms,"

as compared to the "weighty interest" in avoiding corruption or

the appearance of corruption.  Buckley, 424 U.S. at 29.

---

[8] Under exacting scrutiny, the government would bear the
burden of demonstrating that "(1) the statute as a whole . . .
serve[s] a compelling governmental interest, and (2) a substantial
nexus . . . exist[s] between the served interest and the
information to be revealed."  Daggett, 205 F.3d at 464 (citation
omitted) (internal quotation marks omitted).

-20-

Law 222's challenged provisions plainly are more like the regulation given strict scrutiny by the Supreme Court in Citizens United than the contribution limits and disclosure requirements afforded less stringent review. Law 222 imposes substantial burdens on the very process through which a juridical person determines whether and how to exercise its free speech rights. On its face, Law 222 forbids juridical persons from spending any money on political campaigns, be they direct contributions, independent expenditures, or otherwise, without the process the statute prescribes. These provisions are backed by criminal sanctions, administrative penalties of up to $30,000 per day, and other mechanisms designed to ensure strict compliance. Indeed, a violation of section 6.010 can subject a juridical person's "highest ranking official" to personal financial liability for any violations, even if that individual lacked knowledge of the violation in question.

To avoid these unusually harsh sanctions, juridical persons "have to comply with these regulations just to speak." Citizens United, 130 S. Ct. at 897. To adopt the Court's language, by forbidding juridical persons from exercising their speech rights without first complying with onerous governance procedures, the provisions "'necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the

-21-

depth of their exploration, and the size of the audience reached.'" Id. at 898 (quoting Buckley, 424 U.S. at 19).

Law 222 reaches deep into the mechanics of an organization's own self-governance and imposes numerous requirements on the organization's internal processes. In doing so, it seeks to dictate the terms and circumstances under which they are permitted to express political opinions. Stated differently, Law 222's challenged provisions are designed to regulate the if and how of a juridical person's political speech. It is difficult to conceive of a statute that strikes more deeply at a juridical person's core First Amendment rights. Accordingly, strict scrutiny applies.

## 2. Application of Strict Scrutiny to Law 222

"Under strict scrutiny, [defendants] must prove that [the statute] . . . furthers a compelling interest and is narrowly tailored to achieve that interest." Wisc. Right To Life, 551 U.S. at 464. "Especially where, as here, a prohibition is directed at speech itself, and the speech is intimately related to the process of governing, . . . the burden is on the government, [rather than the plaintiffs], to show the existence of [a compelling] interest." Bellotti, 435 U.S. at 786 (internal citation omitted) (quotation marks omitted).

Due to defendants' failure to present any defense to the unions' claims, the only conceivable interest we can identify is

described in the following paragraph of Law 222's Statement of

Motives:[9]

> [C]ertain criteria and requirements shall be
> established to ensure that the members of
> those entities are duly informed of any
> political statements that could be issued by
> such entities on their behalf and at their
> expense. By setting forth clear and effective
> guidelines on this matter, the members of
> juridical entities are provided with the
> necessary information for them to give their
> informed consent. The State, by means of this
> Act, seeks to implement openness and clarity
> as the public policy that shall govern
> election processes.

Thus, Law 222 purports to foster democratic decisionmaking

processes within juridical persons and to ensure that any

political speech that they make is given with their members' full

and informed consent.

As admirable as this policy goal may be, Citizens United

addressed a similar interest and concluded that it was not

sufficiently compelling. There, the government asserted that

independent expenditures could be limited because dissenting

---

[9] The district court discussed a part of the Statement of Motives that addressed the need to "better identify and prevent corrupt and unlawful actions" and emphasized the value of "transparency on [sic] the voting system of Puerto Rico," so that the "People know who provides funding for campaign activities and advertisements intended to sway their opinion." This part of the Statement appears to address the statute's disclosure requirements, which are not at issue here. Defendants do not assert that Law 222's authorization requirements are justified by an interest in transparency to the public at large, nor is a connection between the challenged provisions and such an interest evident. Consequently, we do not rely on this part of the Statement in identifying the government interest at stake.

shareholders needed protection "from being compelled to fund corporate political speech." 130 S. Ct. at 911. The Court was unconvinced, noting that there was "little evidence of abuse that cannot be corrected by shareholders 'through the procedures of corporate democracy.'" Id. (quoting Bellotti, 435 U.S. at 794). Similarly, there has been no invocation here of legislative findings that juridical persons are engaging in abuse of their internal procedures in order to suppress the speech of their dissenting members, or that their internal governance mechanisms are insufficient to address such concerns. We therefore cannot accept this rationale as a justification for the statute.

Even if Law 222's provisions were justified by a compelling interest in fostering juridical persons' internal democratic procedures, the statute is far from narrowly tailored to meet that end. The most problematic aspect of the statute is section 6.010, which describes the detailed scheme that a juridical person must comply with in making any election-related expenditures. Among other requirements, the juridical person must hold a membership meeting, where the members must vote to approve any "use of the money or property of the entity for election-related purposes."[10] The members "shall be informed of

---

[10] Section 2.004(42) of Law 222 defines "Membership" or "Members" as "persons entitled to vote in a juridical person such as shareholders, partners, members subject to membership fees and who are entitled to vote in the entity in question." Although the statute repeatedly refers to "members," it is clear that its

the purposes of the electioneering communication or communications that shall be paid for, including the specific purpose of the messages to be transmitted and the amount of money that shall be earmarked to such campaign," and the members must "be clearly informed of whether they, as an organization, intend to support, oppose, or advocate for the election or defeat of a political party, ideology, aspirant, or candidate."  What is more, "a majority plus one" of the juridical person's members not only must attend this membership meeting, but also must approve the election-related expenditure before funds can be disbursed.

If these restrictions were not burdensome enough, Puerto Rico's election comptroller has issued regulations further defining the statute's terms.  See Government of Puerto Rico, Office of the Electoral Comptroller, Regulations No. 16, Regulations to Incur Independent Expenditures and to Establish a Segregated Funds Committee (2012) [hereinafter "Regulations"]. These regulations require the "membership meeting" to be "an assembly to be held simultaneously in various jurisdictions or geographic areas provided they are held on the same day up to 12:00 midnight," Regulations, § 7.4 (emphasis added), meaning that

_____

restrictions apply to individuals who hold some form of ownership interest or voting stake in entities such as corporations and partnerships.  See also id. § 2.004(56) (defining "juridical person" as "includ[ing] corporations, limited liability companies, partnerships, cooperatives, trusts, groups of persons organized as an association, and labor organizations").

-25-

"a majority plus one" of the entity's members must meet <u>on the</u> <u>same day</u> (although not necessarily in the same location). The <u>only</u> issue that can be discussed at this congregation is the expenditure for election-related purposes. Additionally, the regulations require that the "maximum amount" to be expended must be stated in the notice calling for the meeting, as well as disclosed to the members at the meeting. <u>Regulations</u>, § 7.3. Moreover, noncompliance subjects a juridical person to an array of sanctions, including daily fines, penalties against the person's highest ranking official, and makes "payment in violation of the provisions of [the statute]" a felony punishable by criminal fines.

Law 222 therefore piles burden upon burden in its effort to restrict the political speech of juridical persons, without any indication that these measures are remotely necessary to meet the articulated government interest. Leaving aside the draconian nature of the civil and criminal penalties at issue, the rationale for many of its requirements is difficult to fathom. Why is it necessary to require a single collective membership meeting to discuss campaign expenditures, or to demand that a majority of the membership be present to approve election-related expenditures? Why must all members meet on a single day? Why must the membership discuss only the election-related expenditure at this meeting and decline to address any other subjects? Even if some

-26-

measure of restriction on juridical persons' internal procedures were justified, why these specific procedures, and toward what end? Given their refusal to defend the merits of such provisions, defendants leave all of these crucial questions unanswered. In the absence of a discernible rationale for the challenged provisions, we cannot presently conclude that the challenged provisions are narrowly tailored to serve a compelling state interest.

In sum, Law 222's challenged provisions are not likely to withstand strict scrutiny. For the reasons stated, the unions have demonstrated a strong likelihood that they will succeed on their First Amendment challenge to Law 222.[11]

### 3. Potential for Irreparable Injury

There is no need for an extensive analysis of this element of the preliminary injunction inquiry. Because we conclude that plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well. See Elrod, 427 U.S. at 373; Maceira, 649 F.2d at 18 ("It is well established that the loss of first amendment freedoms constitutes irreparable injury."); see also Phelps-Roper v. Nixon, 545 F.3d 685, 690 (8th

---

[11] Because we conclude that the unions' First Amendment claims are likely to succeed on their merits, we do not address their contention that the statute as drafted is void for vagueness.

-27-

Cir. 2008) ("If [plaintiff] can establish a sufficient likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as a result of the deprivation."). The district court therefore erred in its finding that plaintiffs failed to make a sufficient showing of irreparable injury. See Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1, 690 F.3d 996, 1004 (8th Cir. 2012) (holding that district court's error in finding that plaintiff did not establish high likelihood of success on the merits of its First Amendment claim meant that it necessarily erred in its finding that plaintiff did not establish irreparable harm).

### 4. Balance of Harms and Public Interest

The district court blended the third and fourth components of the preliminary injunction analysis and determined that the balance of the equities and the public interest justified denial of the injunction. The court determined that the government would be stripped of its tools to implement its informational interest and the public would be left uninformed. As noted, this finding is based on a misapprehension by the district court of the scope of plaintiffs' challenge to Law 222, since plaintiffs have explicitly disavowed any challenge to the law's accounting, disclosure, and reporting requirements.

Furthermore, the Supreme Court noted in Citizens United that the suppression of political speech harms not only the

-28-

speaker, but also the public to whom the speech would be directed: "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." 130 S. Ct. at 898. To deprive plaintiffs of the right to speak will therefore have the concomitant effect of depriving "the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." Id. at 899. This deprivation would be especially significant in the election context. Id. ("[I]t is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes."). The district court failed to consider the interest of the public in having a robust debate on the issues of concern to plaintiffs.

In further explanation of its denial of the preliminary injunction, the district court relied heavily on our decision in Respect Maine PAC in support of its two central findings: (1) that granting plaintiffs' requested relief would cause substantial disruption, and (2) that plaintiffs' alleged delay in bringing the action justified the denial of relief. This reliance was misplaced. Respect Maine PAC concerned a public matching-funds scheme for candidates for state office. Under that scheme, candidates had to declare early in their campaigns whether to accept public matching funds. If a candidate opted in to the

public funds scheme, she had to agree to abide by certain rules, including a $750 cap on individual contributions. See Cushing v. McKee, 738 F. Supp. 2d 146, 148-49 (D. Me. 2010) (describing provisions of Maine public matching-funds scheme). By the time the plaintiffs in Respect Maine PAC filed their complaint, candidates for state office had been on the campaign trail for more than eight months, and roughly 280 candidates had opted in to the scheme. See Maine PAC, 622 F.3d at 16.

The instant case is easily distinguished from Respect Maine PAC on the issues of timing and delay. The law at issue there had been in place for more than a decade and had endured several election cycles. Id. At the time the complaint in the instant case was filed, Law 222 was only seven-and-a-half months old, and it was a response to Citizens United, which dramatically changed prior law on the First Amendment rights of corporations and unions. As already noted, there is evidence in the record that since Law 222 was passed, the unions have been consistently developing their platform and campaign plans.

Moreover, the consequences of disrupting the public financing scheme at issue in Respect Maine PAC in the crucial weeks before the campaign would have been significant and chaotic, largely because granting the injunction would have altered rules that candidates and the public had rightfully relied upon for years. See Respect Maine PAC, 622 F.3d at 16. In the instant

-30-

case, there is simply no evidence that any such disruption would occur. The only consequence of this injunction will be that juridical persons who were unlawfully prevented from engaging in political speech will now be able to engage in such speech.

## V. Conclusion

On October 11, 2012, we granted plaintiffs' motion for an appellate injunction pending the disposition of this appeal. That order enjoined enforcement of Sections 6.007-.010 of Law 222. Now that we have resolved the plaintiffs' interlocutory appeal, we hereby dissolve the appellate injunction and remand to the district court with instructions to enter the following order forthwith:

> The defendants are hereby enjoined from enforcing the following provisions of Law 222: 1) Section 6.010 in full; 2) the provision of Section 6.007 that states, "[i]n order for a juridical person to be able to establish a segregated committee or fund for these purposes, it must comply with the limitations and requirements set forth in Section 6.010 of this Chapter"; and 3) the provision of Section 6.009 that states "[t]o make contributions or incur in this type of expenditures, a juridical person must obtain authorization of the majority vote of its members, as provided in Section 6.010 of this Act.

We do not enjoin the enforcement of Section 6.008, which sets limits for contributions from segregated committees and political action committees. Those limits have not been challenged here. Similarly, nothing in our order should be construed to undermine any disclosure requirements in other

sections of Law 222. These requirements are also unchallenged here.

Mandate shall issue forthwith.

So ordered.

**Statutory Appendix**

Law No. 222, P.R. Stat. Ann. tit. 16, §§ 625g-625j.

Section 6.007.-Juridical Persons.-

No juridical person shall make contributions out [sic] its own resources in or outside Puerto Rico to any political party, aspirant, candidate, campaign committee, or to any authorized agent, representative, or committee thereof, or to political action committees that make contributions or coordinate expenditures among them. However, it may establish, organize, and administer a committee, to be known as a segregated committee or fund that, for the purposes of contributions and expenditures, shall be treated as a public action committee that must be registered in the Office of the Election Comptroller, render reports, and comply with all requirements imposed under this Act. Thus, its members, employees, and their immediate family or related persons may make contributions that shall be deposited in the account established and registered in the Office of the Election Comptroller. In order for a juridical person to be able to establish a segregated committee or fund for these purposes, it must comply with the limitations and requirements set forth in Section 6.010 of this Chapter. The committee, organization, or citizen group may make donations from said account to political parties, aspirants, candidates, and campaign committees and authorized committees, as well as to political action committees making contributions to any of them.
P.R. Stat. Ann. tit. 16, § 625g.

Section 6.008.-Limits for Segregated Committees and Public Action Committees.-

Segregated committees or funds may make contributions to any political party, aspirant, candidate, campaign committee, and authorized committees, and to any authorized agent and representative thereof, provided that the contributions do not exceed the limits established in this Act for natural persons or aggregates. These limits shall also apply to contributions made by members to a juridical person that shall use them to make a contribution to a political party, aspirant, candidate, campaign committee, and authorized committee, or to any authorized agent and representative thereof. Two (2) or more political action committees shall be deemed to be one (1) single committee if they have been established by the same person or group of persons, are controlled by the same person or group of persons, or share officials, directors, or employees.

P.R. Stat. Ann. tit. 16, § 625h.

Section 6.009.-Independent Expenditures.-

Nothing in this Act shall limit contributions of money or anything of value made for election-related purposes to natural persons, juridical persons, or political action committees that do not contribute or incur coordinated expenditures with political parties, aspirants, candidates, campaign committees, or authorized committees, or with any authorized agent and representative thereof. However, in these cases, the provisions of Section 6.001 of this Act shall apply. To make contributions or incur in this type of expenditures, a juridical person must obtain the authorization of the majority vote of its members, as provided in Section 6.010 of this Act.
P.R. Stat. Ann. tit. 16, § 625i.

Section 6.010.-Authorization to Establish a Segregated Committee or Fund or to Incur Expenditures of Election-related Purposes.-

1. The juridical person must hold a membership meeting. The call for such meeting shall be issued fifteen (15) days before the holding thereof and shall only include this authorization purpose.

2. At the meeting, the majority plus one of the total members of the entity, whether a corporation, cooperative, partnership, association, or labor organization, shall approve by direct and secret vote the use of the money or property of the entity for election-related purposes. Under no circumstances shall a vote that has not been cast be counted as a vote in favor of the use of money or the property for election-related purposes.

3. For such authorization, the members shall be informed of the purposes of the electioneering communication or communications that shall be paid for, including the specific purpose of the messages to be transmitted and the amount of money that shall be earmarked to such campaign. Before voting at the meeting, the members shall be clearly informed of whether they, as an organization, intend to support, oppose, or advocate for the election or defeat or a political party, ideology, aspirant, or candidate. No organizational structures shall be created to evade the requirement of obtaining the informed consent of the members of any juridical person.

4. The board of directors and the highest ranking official of the juridical person in question shall certify, under oath and under penalty of contempt, that all the requirements of this Section were met. The certification shall include the notice sent to all

members and the date thereof, the date and the place of the meeting, the total number of members of the juridical person, the number of members that attended the meeting, the exact results of the voting, and an accurate and detailed description of the information regarding the amount of money or property that was approved. This sworn certification shall state the veracity and accuracy of the information furnished. In addition, the Election Comptroller shall immediately publish said certification over the Internet.

5. Said certification shall be remitted, on the business day following the voting, to the Office of the Election Comptroller. After obtaining the corresponding authorization and remitting the aforementioned certification, the entity shall register in the Office of the Election Comptroller as an entity that intends to incur expenditures for election-related purposes or make contributions, and render the appropriate reports. The registration of such entity shall be carried out according to the demands and requirements of a Political Action Committee.

6. Any executive, director, manager, managing partner, and the highest ranking official thereof at the time the contribution or expenditure was made for election-related purposes in violation of this Section shall be responsible for compensating the juridical person ten thousand dollars ($10,000) or the amount of the contribution or expenditure, plus any lawfully applicable interest, whichever is higher. This responsibility shall be separate and independent from any other fine or offense set forth in this or any other Act. Any member of the juridical person may request the refund established in this Section to the Court. Any member of the juridical person may file a complaint, under oath, with the Office of the Election Comptroller to report any violations of this Section, or resort to the Court in the event that his/her complaint is not addressed.

7. This process may be regulated by the Office of the Election Comptroller subject to the requirements of this Act.
P.R. Stat. Ann. tit. 16, § 625j.