LAURA TAYLOR SWAIN, United States District Judge *293 Before the Court is the Motion of Peaje Investments LLC (A) for Temporary Restraining Order and Preliminary Injunction, and (B) for Relief from Stay or, Alternatively, Adequate Protection (docket entry[2] no. 2 (the "Motion") ).[3] An evidentiary hearing on the Motion took place before the undersigned on August 8, 2017 (the "August Hearing"), and the evidentiary record is now closed. The Court has considered carefully the submissions of both parties and the evidentiary record, including the argument and testimony presented at the August Hearing and the parties' subsequently-filed written closing arguments.
For the reasons that follow, the Motion is denied in its entirety. This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a)(2) and 65, made applicable in these adversary proceedings by Federal Rules of Bankruptcy Procedure 7052 and 7065.
I.
FINDINGS OF FACT
The Puerto Rico Highways and Transit Authority ("HTA") is a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). 9 L.P.R.A. § 2002. (Docket entry no. 1, Adversary Complaint ("Compl.") ¶ 21; Docket entry no. 96, Memorandum of Law in Opposition ("Opp.") p. 7.) HTA was created by Act No. 74-1965 (the "HTA Enabling Act"). 9 L.P.R.A. § 2002. (Compl. ¶ 21; Opp. p. 10.)
The HTA Enabling Act empowers HTA to "borrow money for any of its corporate *294 purposes, and to issue bonds of the [HTA] in evidence of such indebtedness and to secure payment of bonds and interest thereon by pledge of, or other lien on, all or any of its properties, revenues or other income." 9 L.P.R.A. § 2004(l). (Compl. ¶ 33.) The HTA Enabling Act also empowers HTA to "from time to time issue and sell its own bonds and have them outstanding for any of its corporate purposes." 9 L.P.R.A. § 2012(a).
The HTA Enabling Act further empowers HTA to promulgate resolutions authorizing the issuance of bonds, which resolutions "may contain provisions, which shall be a part of the contract with the holders of the bonds," including provisions relating to "the disposition of the entire gross or net revenues and present or future income or other funds of the [HTA], including the pledging of all or any part thereof to secure payment of the principal of and interest on the bonds to the extent permitted by the provisions of § 2004(l)." 9 L.P.R.A. § 2012(e)(1). Under the HTA Enabling Act, the "bonds of [HTA] bearing the signature of the officers of [HTA] in office on the date of the signing thereof shall be valid and binding obligations, notwithstanding that before the delivery thereof and payment therefor any or all of the officers whose signatures or facsimile signatures appear thereon shall have ceased to be such officers of [HTA]." Id. § 2012(c).
HTA promulgated a resolution authorizing the issuance of bonds on June 13, 1968 (the "1968 Resolution"). (Compl. ¶ 34; Docket entry no. 99, Declaration of Bradley R. Bobroff, Ex. 3 (the 1968 Resolution).) The 1968 Resolution provides for the creation of certain funds and accounts, with the monies held in those funds and accounts "subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Resolution." (1968 Resolution § 401; see Compl. ¶ 35.) HTA "covenant[ed]" in the 1968 Resolution to deposit certain defined "Revenues" in the accounts covered by this lien, including the "Toll Revenues" charged by HTA for the use of enumerated "Traffic Facilities." (1968 Resolution §§ 101, 401; see Compl. ¶ 35.) The 1968 Resolution requires that the Revenues be deposited with a Fiscal Agent on a monthly basis. (1968 Resolution § 401; see Compl. ¶ 37.) Section 601 of the 1968 Resolution further provides that the 1968 Bonds "are payable solely from Revenues and from any funds received by [HTA] for that purpose from the Commonwealth which Revenues and funds are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified." (1968 Resolution § 601.)
The 1968 Resolution requires that HTA "not incur any indebtedness nor create or cause or suffer to be created any debt, lien, pledge, assignment, encumbrance or any other charge having a priority to or being on a parity with the lien on Revenues on the Bonds," except upon certain enumerated conditions. (1968 Resolution § 602; see Compl. ¶ 40.)
Peaje Investments LLC ("Peaje") is the beneficial owner of approximately $65 million in bonds issued pursuant to the 1968 Resolution (which series of bonds will be referred to as the "1968 Bonds," and the holders of those bonds, as the "1968 Bondholders"). (Compl. ¶ 20.) In connection with the instant adversary proceedings and motion practice, Peaje asserts that it has "lien rights" in connection with the 1968 Bonds that arise solely from the language of (1) the Enabling Act, and (2) the 1968 Resolution. (Compl. ¶ 78.)
In January 2015, the Commonwealth enacted Act 1-2015, which added Section 12A to the HTA Enabling Act. This new section provides, in relevant part, that after *295 the occurrence of certain conditions precedent, "liens and pledges are hereby created and executed" on certain revenues, including for the benefit of the holders of 1968 Bonds. P.R. Act No. 1-2015 § 12A(b). These statutory conditions precedent have never been satisfied.
On April 6, 2016, the Commonwealth enacted the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act No. 21-2016 (the "Moratorium Act"). Pursuant to the Moratorium Act, then-Governor Alejandro García Padilla of Puerto Rico issued certain executive orders (the "Executive Orders") that suspended HTA's obligation to deposit Revenues with the Fiscal Agent (as these terms are defined in the 1968 Resolution) beginning in May 2016. (Compl. ¶¶ 45-48.) In January 2017, the Commonwealth enacted the Puerto Rico Financial Emergency and Fiscal Responsibility Act of 2017, Act No. 5-2017 (the "Financial Emergency Act"). The Financial Emergency Act provides, in relevant part, that executive orders issued under the Moratorium Act "shall continue in full force and effect until amended, rescinded or superseded." Financial Emergency Act § 208(e).
HTA has ceased depositing the Toll Revenues with the Fiscal Agent. (Compl. ¶ 60.) Defendants proffered unrebutted testimony that HTA is using the Toll Revenues, among other revenue streams, to maintain both the Traffic Facilities and other components of the Commonwealth's transportation infrastructure. (See Transcript of August Hearing ("Tr.") at 69:3-22, 86:5-15, 96:6-98:4.) Defendants also proffered the testimony of Sergio L. Gonzalez, the former Executive Director of HTA, who testified that HTA's retention of the Toll Revenues is necessary to ensure that the Traffic Facilities and other transportation infrastructure of the Commonwealth will remain in working order. (Ex. SSS ¶¶ 6, 33, 47-56.) Peaje did not tender credible evidence demonstrating that the Traffic Facilities, from which the Toll Revenues are drawn, could be maintained in working order absent this Toll Revenue funding, instead proffering only the testimony of Dr. Hildreth, who opined that there was a possibility that the necessary funds could be drawn from other sources. (See, e.g., Ex. 91 ¶¶ 15-17.) The Court does not find Dr. Hildreth's testimony credible on this point, as he acknowledged under cross-examination that he did not perform any independent analysis of the availability of the potential sources of funding he identified, nor did he have any independent knowledge about the repercussions of drawing on such sources for transportation maintenance purposes. (Tr. at 184:3-190:17.)
Peaje presented the testimony of Thomas Stanford in support of its argument that the equity cushion (i.e., the value of the collateral in excess of the value of any allegedly secured claims) supporting the 1968 Bonds would be eroded by HTA's use of the Toll Revenues to fund its general expenses rather than depositing those funds with the Fiscal Agent. Stanford could not, however, testify with any certainty that Peaje actually had an equity cushion as of the date the Title III petition for HTA was filed, nor could he state with certainty that Peaje's equity cushion was actually likely to be depleted. Instead, Stanford's testimony presented 21 different hypothetical scenarios based on different assumptions. (See Tr. 58:14-59:6; Ex. 92 ¶¶ 3-4; Ex. 93 ¶¶ 4-12.) In one-third of those scenarios, the value of Peaje's equity cushion would not be fully depleted even if Defendants made no payments for two full years. (Ex. 93 ¶ 14.) The Court finds that Stanford's testimony does not provide a sufficient basis for a determination that any one of the 21 scenarios is necessarily likely to occur, nor for a conclusion that *296 one of the scenarios showing elimination of Peaje's equity cushion is in fact the most likely to occur.
II.
CONCLUSIONS OF LAW
In determining a motion for a preliminary injunction, this Court considers: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs and (4) the effect, if any, on the public interest." Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007) ). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). In order to establish likelihood of success on the merits, "plaintiffs must show 'more than mere possibility' of success-rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueno, 699 F.3d at 10 (quoting Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010) ).
Peaje's motion for a preliminary injunction seeks an order directing HTA to resume depositing Toll Revenues with the Fiscal Agent, and prohibiting the Commonwealth from interfering with the execution of that order. For the reasons that follow, the Court concludes that Peaje has not demonstrated either (i) a likelihood of success on the merits of its underlying claim that the 1968 Bonds are secured by a statutory lien that is exempt, pursuant to 11 U.S.C. §§ 922(d) and 928, from the automatic stay imposed by 11 U.S.C. § 362, made applicable in these proceedings by 48 U.S.C. § 2161, or (ii) that the absence of preliminary injunctive relief would result in irreparable harm to Peaje. Accordingly, Peaje has not demonstrated-on this record-entitlement to preliminary injunctive relief.
Section 2161 of Title 48 of the United States Code makes certain provisions of Title 11 of the United States Code (the "Bankruptcy Code") applicable to these proceedings under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), including, as relevant to these proceedings, Sections 101, 362, 902, 922, and 928 of the Bankruptcy Code.
Section 362(a)(3) of the Bankruptcy Code, as applicable here, provides that the filing of a PROMESA Title III case "operates as a stay" of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Section 922(d) of the Bankruptcy Code enumerates certain exceptions to this general injunction, including a provision that the filing of a PROMESA Title III petition "does not operate as a stay of application of pledged special revenues in a manner consistent with section [928][4] of [Title 11] to payment of indebtedness secured by such revenues." In turn, Section 928(a) provides, in relevant part, that "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security *297 agreement entered into by the debtor before the commencement of the case."
Peaje contends that Section 922(d) mandates the "application" of such pledged special revenues to the payment of secured indebtedness and that, because the lien securing the revenues is statutory in nature, the gross Toll Revenues must be applied to service the 1968 Bonds. Peaje's ability to show a likelihood of success on the merits of its underlying claims in this action therefore requires an initial showing that the transfer of the Toll Revenues to the Fiscal Agent for payment to the 1968 Bondholders would be the "payment of indebtedness secured by [pledged special] revenues" under Section 922(d) that could be exempt from the automatic stay pursuant to Section 928(a). The Defendants have not contested that the Toll Revenues are "pledged special revenues" within the meaning of 11 U.S.C. § 902(2)(A), and accordingly the Court concludes that Peaje has demonstrated a likelihood of success on the merits of this first aspect of its claim. The Court therefore turns to the question of whether Peaje has established a likelihood of success on the merits of its argument that the 1968 Bonds are secured by a statutory lien.[5]
Peaje asserts that the 1968 Bonds are secured by a statutory lien arising from the HTA Enabling Act and the 1968 Resolution. The Court concludes that Peaje has not demonstrated a likelihood that it will succeed on the merits of establishing that either of these two documents created a statutory lien securing the 1968 Bonds.
"[T]here are two types of secured claims: (1) voluntary (or consensual) secured claims, each created by agreement between the debtor and the creditor and called a 'security interest' by the [Bankruptcy] Code, and (2) involuntary secured claims, such as a judicial or statutory lien, which are fixed by operation of law and do not require the consent of the debtor." U.S. v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (internal citations omitted); see also 11 U.S.C. § 101(53) (defining statutory lien as a lien "arising solely by force of a statute on specified circumstances or conditions"). In the context of this motion practice, Peaje relies solely on the claim that the 1968 Bonds are subject to an involuntary statutory lien, and that both the HTA Enabling Act and the 1968 Resolution are statutes that, by operation of law, give the 1968 Bondholders a secured claim on the Toll Revenues.
Peaje has not identified a lien that arises "solely" by force of the HTA Enabling Act "on specified circumstances or conditions" as required by Section 101(53). Rather, the HTA Enabling Act provides that HTA may issue bonds pursuant to resolutions, which resolutions "may" contain provisions "pledging" certain revenues to bondholders, which provisions "shall be a part of the contract with the holders of the bonds." HTA Enabling Act § 2012(e). No lien arises solely by force of this statutory provision. Rather, this provision permits HTA to enter into certain types of consensual liens-contracts between HTA and the bondholders. Peaje's invocation of the language in the HTA Enabling Act that provides that bonds are "valid and binding obligations" is similarly insufficient to establish a statutory lien. This phrase is drawn from Section 2012(c) of the HTA Enabling Act and, read in its full context, establishes only that HTA bonds are valid *298 and binding "notwithstanding that before the delivery thereof and payment therefor any or all of the officers whose signatures or facsimile signatures appear thereon shall have ceased to be such officers of the [HTA]." Id. § 2012(c). This provision does not operate independently to secure any claims but, rather, preserves the validity of consensual agreements between HTA and bondholders despite the turnover of HTA personnel.
The cited provisions of the HTA Enabling Act differ starkly from the statutes at issue in the cases cited by Peaje in which courts found the existence of statutory liens. For example, in In re Braxton, the statute at issue provided that certain "contributions and the interest and penalties thereon due and payable ... shall be a lien upon the franchises and property ... of the employer liable therefor and shall attach thereto from the date a lien for such contributions, interest and penalties is entered of record." 224 B.R. 564, 567 (Bankr. W.D. Pa. 1998) (quoting 43 P.S. § 788.1 (1991) (emphasis added) ). Under the statute at issue in Braxton, no agreement was necessary for a lien to be created.
A similar statutory provision was at issue in Fonseca v. Government Employees Association (AEELA), 542 B.R. 628 (1st Cir. BAP 2015). In Fonseca, the court considered a statute that liquidated the monetary value of an employee's paid leave time when the employee retired, and provided for a lump sum payment to the employee, which lump sum "shall be subject to other deductions authorized by law." Id. at 637 (quoting 3 P.R. Laws Ann. § 703d ). The Fonseca Court held that because "the statute specifically provides that the lump sum payment for the liquidation of accumulated leave can be withheld ... [those] sections give rise to a statutory lien." Id. As in Braxton, the statute in question defined with specificity the nature of the collateral and required no further discretionary action for a lien to come into force. It was, quite plainly, a lien "arising solely by force of a statute." 11 U.S.C. § 101(53).
Peaje correctly notes that the statutory liens in Braxton and Fonseca were created only on the performance of certain conditions (e.g., accrual of contribution liabilities; entering the lien on record), but the HTA Enabling Act creates no automatic lien even upon the performance of conditions. Rather, the HTA Enabling Act provides that a "contract" between HTA and a third party may contain a lien, which consensual lien would be enforceable assuming that it satisfied certain conditions. In this respect, the HTA Enabling Act is not meaningfully different from Article 9 of the Uniform Commercial Code, which is a model statutory provision that defines certain conditions under which a lien becomes enforceable. That a lien arising under Article 9 is enforceable because of statutory provisions does not, however, make that lien a statutory lien under Section 101(53) of the Bankruptcy Code ; similarly, that HTA's liens trace their validity to the HTA Enabling Act's grant of authority to create liens does not make liens that HTA subsequently decided to create statutory in nature.
Peaje has similarly failed to demonstrate a likelihood of success on the merits of its argument that the 1968 Resolution created statutory liens. Simply put, the 1968 Resolution is not a statute. The Bankruptcy Code does not define "statute," and so the Court looks to relevant secondary sources for the definition of this term. Black's Law Dictionary (10th ed. 2014) defines a "statute" as "a law passed by a legislative body; specifically, legislation enacted by any lawmaking body, such as a legislature, administrative board, or municipal court." HTA, a public corporation and instrumentality of *299 the Commonwealth, is certainly not a legislature. Nor does Peaje cite any legal authority to support the proposition that a resolution of a public corporation is statutory in nature. Rather, the cases Peaje cites stand for the proposition that the administrative rulemaking of an executive body by regulation can, in certain circumstances, be statutory. See, e.g., Armstrong v. Ramos, 74 F.Supp.2d 142, 149 (D.P.R. 1999) (holding that a particular regulation was "a legislative rule" and therefore "becomes part of the agency's enabling act and has the same legal status as a law passed by the legislature" because the regulation was "issued by an agency pursuant to a statutory delegation and implement[ed] the statute"). Peaje has not shown that the 1968 Resolution is, by its terms, an administrative regulation under Puerto Rican law or statutory in any other respect, and therefore has not shown that the 1968 Resolution gives rise to a statutory lien.
Accordingly, the Court concludes that Peaje has failed to establish a likelihood of success on the merits of its claim to a statutory lien that could provide a proper basis for injunctive relief.[6]
Peaje has also failed to establish that it will suffer irreparable harm absent preliminary injunctive relief. Peaje has not proffered credible evidence demonstrating that the value of its alleged collateral is diminishing due to Defendants' actions. Rather, Peaje tendered only speculative testimony by Stanford, which was based on unproven and unsubstantiated assumptions about macroeconomic conditions in the Commonwealth-and which testimony did not establish with any certainty that the value of Peaje's equity cushion is likely to be further depleted at all or in the near term. Indeed, Stanford's testimony indicated that there was an appreciable probability that Peaje would continue to have an equity cushion even if the Defendants failed to transfer any Toll Revenues to the Fiscal Agent for two full years, a time frame within which the issue of confirmation of a plan of adjustment for HTA could be resolved. The Court therefore concludes, having considered the totality of the record, that Peaje has not established that the lack of injunctive relief would result in irreparable harm, even were it able to demonstrate the existence of a lien.
Absent a likelihood of success on the merits or a demonstration of irreparable harm, Peaje is not entitled to preliminary injunctive relief, and that aspect of Peaje's motion is accordingly denied.
Peaje moves, in the alternative, for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1). As an initial matter, Peaje's failure to establish, on this record, that it has a statutory lien means that it has similarly failed to establish an "interest in property" required to demonstrate cause to lift the stay.
Even were Peaje able to demonstrate such an interest, however, the Court concludes that the Defendants have established that Peaje's interests are adequately protected by Defendants' efforts to maintain the Commonwealth's toll roads in working condition to ensure that the Toll Revenues will be available in the future. The Court finds credible and persuasive the written and oral testimony of former HTA Executive Director Gonzalez, which demonstrated that removing the Toll Revenues from HTA's available resources *300 would severely diminish HTA's ability to maintain the Commonwealth's toll roads-and the other Commonwealth roads necessary for vehicular access to the toll roads-in working order. The Commonwealth and HTA's efforts to maintain those roads preserves the future availability of the revenue stream that Peaje argues secures the 1968 Bonds.
As noted above, the Court does not find the rebuttal testimony of Dr. Hildreth credible or persuasive, as Dr. Hildreth did not conduct any independent investigation into the actual availability of the sources of money he identified as potentially available to HTA. The Court concludes that the Defendants have met their burden of showing that Peaje's interest is adequately protected by HTA's use of the Toll Revenues to maintain the Commonwealth's toll road infrastructure to ensure that the Toll Revenue stream will continue to flow after the conclusion of the Title III proceedings.
Accordingly, the Court concludes that, insofar as Peaje may be entitled to adequate protection, Defendants have carried their burden of proving that the value of Peaje's alleged collateral is being adequately protected by HTA during the pendency of the automatic stay. Peaje's motion for relief from the stay is, accordingly, denied.
III.
CONCLUSION
For the foregoing reasons, the Motion is denied in its entirety.
This Opinion and Order resolves docket entry nos. 2 and 205 in 17 AP 151; nos. 2 and 196 in 17 AP 152; and no. 25 in 17 BK 3567.
SO ORDERED.

All docket entries refer to case no. 17 AP 151, unless otherwise specified.

At a preliminary hearing on the Motion, the movants withdrew their request for a temporary restraining order.

The reference in the text of Section 922(d) is to "section 927," which the parties and the Court agree appears to be a scrivener's error.

The Court does not opine or reach any conclusion here as to whether the 1968 Resolution gives rise to any other type of valid lien, as that question was not presented by the instant motion practice. (See docket entry no. 185 (Memorandum Opinion and Order Granting Motion to Strike).)

Because the Court has concluded that Peaje has not demonstrated the existence of a valid lien, Peaje's arguments that Defendants' actions involve an unconstitutional taking of the value of its lien necessarily fail. Nor need the Court address Peaje's argument that Section 922(d) of the Bankruptcy Code mandates continued payments with respect to obligations secured by pledged special revenues.