# United States Court of Appeals
## For the First Circuit

No. 14-1018
No. 14-1289

AMERICAN FREEDOM DEFENSE INITIATIVE; PAMELA GELLER;
AND ROBERT SPENCER,

Plaintiffs-Appellants,

v.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY; AND BEVERLY A. SCOTT,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS CHIEF EXECUTIVE
OFFICER / GENERAL MANAGER OF THE MBTA,

Defendants-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Barron, Circuit Judges.

Robert Joseph Muise, with whom David Yerushalmi and American
Freedom Law Center were on brief, for appellants.
Joseph D. Steinfield, with whom Jeffrey J. Pyle, Julia A.
Brennan, and Prince Lobel Tye LLP were on brief, for appellees.

March 30, 2015

**BARRON, <u>Circuit Judge</u>.** These consolidated appeals require us to decide whether the First Amendment permits the Massachusetts Bay Transportation Authority ("MBTA") to refuse to display a pair of paid, private advertisements on the trains, buses, and transit stations that the MBTA operates. Many circuits and district courts have addressed the First Amendment issues that public transit authority advertising policies raise. We set forth our approach most recently and most thoroughly in <u>Ridley</u> v. <u>Massachusetts Bay Transportation Authority</u>, 390 F.3d 65 (1st Cir. 2004).

In that case, we considered a free speech challenge to the same aspect of the MBTA's advertising policy at issue in these appeals: the restriction on the display of advertisements that "demean or disparage" individuals or groups. And, as in <u>Ridley</u>, we again conclude that this restriction does not violate the First Amendment, either on its face or as it was applied. We thus affirm the District Court, which reached that same conclusion with respect to the MBTA's refusal to run the two advertisements at issue here, each of which concerns a highly charged issue -- the Israeli-Palestinian conflict.

## I.

The MBTA operates the public transit system in the greater Boston area. Through an advertising agent, the MBTA makes its buses, trains, and transit stations available for the display

of advertisements by private parties. The MBTA accepts most advertisements only upon payment, though the MBTA apparently accepts some public service advertisements for no charge. But the key fact is that the MBTA will not run every advertisement it receives, even when the advertiser is willing to pay the going rate. Instead, each advertisement must conform to the MBTA's Advertising Program Guidelines.

Those Guidelines state that the MBTA's program objectives are maximizing revenue from both advertising and ridership; preserving a safe and orderly operation and a welcoming environment for riders; and avoiding the identification of the MBTA or the Commonwealth with the point of view of the advertisements or the advertisers. To further those ends, the Guidelines restrict what the advertisements may say. The Guidelines also set forth a procedure by which the MBTA may review proposed advertisements that might contain prohibited content. Under that procedure, the MBTA may suggest changes that would permit the advertisements to be accepted upon re-submission.

In these appeals, the parties dispute the lawfulness of the application of the Guidelines to bar two advertisements about the Israeli-Palestinian conflict. These advertisements were submitted by the American Freedom Defense Initiative ("AFDI"), a non-profit advocacy organization dedicated to "freedom of speech . . . and individual rights."

AFDI offered to pay the MBTA to run the first of the advertisements in October 2013. But the actual roots of the dispute reach back somewhat earlier. Months before, the MBTA ran a different non-profit group's advertisement concerning the Israeli-Palestinian conflict. The message of that earlier advertisement was very different from the one in AFDI's advertisement. AFDI makes that fact a centerpiece of its First Amendment challenge.

The earlier advertisement was submitted in September 2013 by a group called the Committee for Peace in Israel and Palestine. The advertisement depicted four maps reflecting different points in time with the caption, "Palestinian Loss of Land - 1946 to 2010." The advertisement also contained bold text to the right of the maps stating that "4.7 Million Palestinians are Classified by the U.N. as Refugees."

The MBTA accepted the advertisement, and it began to run for a fee in October 2013. After receiving complaints about the advertisement later that month, the MBTA briefly ceased displaying the advertisement. But, shortly thereafter, the MBTA re-posted the advertisement. The MBTA claimed that there had been a miscommunication between it and its advertising agent, but did not otherwise explain its decision either to pull the Committee for Peace advertisement or to re-post it.

-4-

Very soon after the MBTA announced it would re-post the Committee for Peace advertisement, AFDI submitted the first of the advertisements at issue in these appeals. This advertisement included, without attribution, a modified version of a quotation from the political theorist Ayn Rand.[1] The advertisement read as follows:

> IN ANY WAR
> BETWEEN THE
> CIVILIZED MAN
> AND THE SAVAGE,
> SUPPORT THE
> CIVILIZED MAN.
> ✡ SUPPORT ISRAEL ✡
> DEFEAT JIHAD

AFDI asked the MBTA to display this ad in ten transit stations where the Committee for Peace advertisement also had been posted.

The MBTA applied the Guidelines' stated procedures for reviewing submitted advertisements. The MBTA, through its General Manager, defendant Beverly Scott, then rejected AFDI's submission. The MBTA concluded that AFDI's submission violated one of its Guidelines -- namely, the prohibition on "advertisement[s] contain[ing] material that demeans or disparages an individual or group of individuals."[2] Scott notified AFDI of the decision on

---

[1] In response to a question about the 1973 Arab-Israeli war, Ayn Rand was quoted as saying, as a reason to support Israel, "[w]hen you have civilized men fighting savages, you support the civilized men, no matter who they are." Ayn Rand, Egalitarianism and Inflation, Address at the Ford Hall Forum (Oct. 20, 1974).

[2] The guideline further provides that, "[f]or purposes of determining whether an advertisement contains such material, the

November 4, 2013.[3]  Two days later, AFDI brought suit in federal court.  The suit alleged violations of the First and Fourteenth Amendments and sought a preliminary injunction ordering the MBTA to run the ad.

The District Court denied the preliminary injunction request on December 20, 2013.  See Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth. ("MBTA I"), 989 F. Supp. 2d 182 (D. Mass. 2013).  The District Court agreed with AFDI "that the most reasonable interpretation of their advertisement is that they oppose acts of Islamic terrorism directed at Israel."  Id. at 189. Nonetheless, the District Court concluded that the references to "jihad" and "savage[s]," taken together and considered in light of the reference to "war," could, as the MBTA argued, reasonably be construed to demean or disparage Muslims or Palestinians, rather than to take aim only at terrorist acts.  Id. at 188.  The District Court also concluded that even though the Committee for Peace advertisement "deeply offends [AFDI] and . . . other members of the community" and "portrays Israel in a negative light," that

___

MBTA will determine whether a reasonably prudent person, knowledgeable of the MBTA's ridership and using prevailing community standards, would believe that the advertisement contains material that ridicules or mocks, is abusive or hostile to, or debases the dignity and stature of, an individual or group of individuals."

[3] The District Court found that there was no evidence that anyone either explained to AFDI how this first submission violated the Guidelines or provided AFDI an opportunity to bring the advertisement into compliance.

advertisement "does not do so in a way that violates the demeaning and disparaging guideline." Id. at 191. By contrast, the District Court explained, "labeling a member of a group 'a savage', as defendants not unreasonably believe is done by plaintiffs' advertisement, directly debases that person's dignity." Id.

The District Court expressed concern that the MBTA could use the guideline to strip messages of their effectiveness. But the District Court read this Court's decision in Ridley v. Massachusetts Bay Transportation Authority, 390 F.3d 65 (1st Cir. 2004), to require the conclusion that, in this context, advertisers "do not have the right to use whatever terms they wish to use . . . simply because they are the most effective means of expressing their message." MBTA I, 989 F. Supp. 2d at 190.

Two weeks later, AFDI submitted a revised version of its proposed advertisement. This second submission read as follows:

IN ANY WAR BETWEEN THE CIVILIZED MAN AND THOSE ENGAGED IN SAVAGE ACTS,
SUPPORT THE CIVILIZED MAN.
DEFEAT VIOLENT JIHAD
✡ SUPPORT ISRAEL ✡

Unlike AFDI's first ad, this second submission referred to "violent jihad" instead of merely "jihad." In addition, the second version's "defeat" clause preceded its "support" clause. In the first AFDI advertisement, by contrast, the two clauses appeared in the opposite order. Finally, and most crucially given the District Court's opinion in MBTA I, AFDI's second version changed

-7-

the language at the beginning of the advertisement. The new language juxtaposed "the civilized man" with "those engaged in savage acts" rather than with "the savage," as had been the case in the first version.

The MBTA accepted AFDI's second submission and requested specifications so that the advertisement could be displayed within a week of its submission. But AFDI chose not to have the MBTA run this second version. Instead, AFDI submitted a new version the day after learning the MBTA had accepted its second submission.

This third advertisement, which AFDI claimed was merely a "tweak[ed]" version of the accepted submission, read as follows:

IN ANY WAR BETWEEN THE CIVILIZED MAN AND THE SAVAGE,
SUPPORT THE CIVILIZED MAN.
DEFEAT VIOLENT JIHAD
✡ SUPPORT ISRAEL ✡

This third version maintained the second version's reference to "violent jihad" (as opposed to merely "jihad," as in AFDI's first ad). The "defeat" and "support" clauses also appeared in the same order as they had in the second ad -- and thus, once again, in the opposite order from how they had appeared in the first ad. But unlike the second ad, which had been accepted, the third version returned to the juxtaposition that had appeared in the initial, rejected version. The revised language once again counterposed "the civilized man" and "the savage" rather than "the civilized man" and "those engaged in savage acts."

-8-

The MBTA rejected AFDI's third submission. The MBTA concluded that, like AFDI's first submission, the third ad violated the guideline that prohibits advertisements containing material demeaning or disparaging individuals or groups. AFDI then again brought suit, seeking another preliminary injunction.

The District Court denied the motion "on the grounds previously set out in its opinion in" MBTA I. Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth. ("MBTA II"), No. 1:14-cv-10292-NMG, 2014 WL 1093138, at *3 (D. Mass. Mar. 17, 2014). In addition, the District Court charged AFDI with "blatant gamesmanship" -- submitting this third version instead of having the MBTA run the second one -- and noted that this "bad faith" was an independent ground for denying the requested equitable relief. Id.

After AFDI timely appealed both decisions, the parties agreed to consolidate the two cases, given their common issues of fact and law and that the appeals involve the same parties. AFDI advances three basic contentions on appeal.

AFDI argues first that the MBTA has so opened up its buses, trains, and transit stations to private advertisements that the MBTA has effectively established what is known as a designated public forum. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983). For that reason, AFDI argues, the MBTA may regulate the content of advertisements only through

restrictions that are narrowly tailored to serve a compelling interest.  See Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 469-70 (2009) (designated public fora "are subject to the same strict scrutiny as restrictions in a traditional public forum"). Further, AFDI argues that, under that strict standard, the MBTA cannot justify the content-based decision to reject the advertisements at issue here.

AFDI next argues that, even if the MBTA has not established a designated public forum and instead is operating only what is known as a nonpublic forum, the MBTA's guideline prohibiting the display of an advertisement that "demeans or disparages" individuals or groups is still facially unconstitutional.  And that, AFDI says, is for either of two reasons.  AFDI argues that the MBTA's guideline necessarily discriminates on the basis of an advertisement's viewpoint.  See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 806 (1985) (explaining that speech restrictions in nonpublic fora must be viewpoint neutral).  And, alternatively, AFDI argues that the guideline is so vague that it confers too much un-cabined discretion on the MBTA to sort between permitted and prohibited ads.  See Ridley, 390 F.3d at 93-95 (discussing the high bar vagueness challenges face in nonpublic forum context).

Finally, AFDI argues that even if its forum argument and facial challenges do not succeed, the MBTA still violated AFDI's

First Amendment rights. AFDI contends that the MBTA's actual application of its guideline (especially given the MBTA's decision to run the Committee for Peace advertisement) was unconstitutional. Specifically, AFDI contends that the MBTA discriminated against the viewpoint expressed in the two rejected AFDI advertisements or, at least, acted unreasonably in denying those ads given the purposes of the MBTA's overall advertising policy.

We consider each of these arguments in turn. In doing so, we explain why, in light of our prior ruling in Ridley -- which, if not strictly controlling as to each issue, is instructive as to all -- we find none of these arguments persuasive.

## II.

Before turning to the merits of AFDI's argument, we note that we are reviewing the denial of a preliminary injunction. In evaluating AFDI's contentions, the standard of review is thus abuse of discretion. Sindicato Puertorriqueño de Trabjadores, SEIU Local 1996 v. Fortuno, 699 F.3d 1, 9 (1st Cir. 2012). That standard, however, applies in this context only to "issues of judgment and balancing of conflicting factors." Water Keeper Alliance v. U.S. Dep't of Def., 271 F.3d 21, 30 (1st Cir. 2001) (quoting Cablevision of Bos., Inc. v. Public Improvement Comm'n, 184 F.3d 88, 96 (1st Cir. 1999)). By contrast, findings of fact are reviewed for clear error, and rulings on legal issues are reviewed de novo. Id. at 30-31. Moreover, in order to secure preliminary injunctive relief,

AFDI must "establish a 'strong likelihood' that they will ultimately prevail" on the merits of their First Amendment claim.[4] Sindicato Puertorriqueño, 699 F.3d at 10 (quoting Respect for Me. PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).

### III.

We start with AFDI's contention that the MBTA's advertising program is so unselective that it constitutes a designated public forum. The MBTA argues we must reject that contention. In support of this point, the MBTA relies on Ridley, which held that the MBTA's advertising program was a nonpublic forum. See 390 F.3d at 78-79. And the MBTA further contends that the law of the circuit doctrine makes Ridley's holding on the forum issue binding on this panel. See United States v. Rodriquez, 311 F.3d 435, 438-39 (1st Cir. 2002) (prior panel decision are "inviolate" absent intervening authority (quoting United States v. Chhien, 266 F.3d 1, 11 (1st Cir. 2001))).

As a result, the MBTA argues, its content-based restrictions on speech need not be narrowly tailored to serve a compelling interest, as AFDI contends. Instead, the MBTA argues

---

[4] In light of our conclusion that AFDI has not demonstrated that it is likely to succeed on the merits in either of its challenges, and because likelihood of success on the merits is the "sine qua non" of the four-part inquiry a district court must undertake in adjudicating a preliminary injunction request, New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002), we do not address the final three factors of the preliminary injunction inquiry in this opinion.

that the restrictions must be upheld under the more forgiving standards that apply in nonpublic fora. See Davenport v. Wash. Educ. Ass'n, 551 U.S. 177, 189 (2007) (restrictions in nonpublic fora are permitted so long as they do not discriminate on the basis of viewpoint and are reasonable in light of the purposes for which the forum was established).

But even though Ridley held that the MBTA was operating a nonpublic forum, AFDI is right that "the forum question is not a static inquiry." Thus, we must still consider whether the MBTA has done anything since Ridley to transform its advertising program from a nonpublic forum into a designated public forum, in which case the MBTA's content-based restriction on disparaging or demeaning advertisements then would be subject to more exacting scrutiny. See Ridley, 390 F.3d at 76 (courts look to "explicit expressions about intent" as well as the actual practice of the government actor in question to determine whether said actor intended to designate a place or program as a public forum).

Ridley based its forum holding in part on the MBTA's formally expressed intention. Ridley explained that the MBTA had consistently maintained that its advertising program constituted a nonpublic forum rather than a designated one open to the display of all manner of private communication without regard to the content of the message. See id. at 77. But Ridley did not rely on the MBTA's expressed intention alone. See id. Ridley also made clear

that, although the MBTA did run many private advertisements, the MBTA had not in practice opened itself up as a forum for the communication of ideas generally. Instead, Ridley concluded that the MBTA was trying only to capitalize on the market for display advertising as part of its general effort to increase revenue. See id. at 79.

Ridley further observed that the MBTA's selectivity in choosing advertisements was, from the start, consistent with that overriding commercial purpose. See id. at 78. Ridley explained that the MBTA had concluded that riders of subways and buses might not appreciate certain kinds of content in the advertisements that those riders would encounter. Thus, the MBTA set forth a number of rules restricting advertising content that were crafted to maximize advertising revenue without thereby adversely affecting its ridership. See id. at 72, 77-78 (describing the MBTA's advertising policy).

As was true in Ridley, the MBTA's advertising policy still states that the MBTA operates a nonpublic forum. And the MBTA's Guidelines still consist of the same basic rules regarding prohibited advertising content as were in place at the time of Ridley. Nor does AFDI argue otherwise.

AFDI contends instead that the MBTA's decision to run the Committee for Peace advertisement shows that the MBTA is now, in actual practice, willing to permit speech on even the most

controversial of issues. And thus, AFDI argues, the MBTA has effectively created a designated public forum, because it is simply incongruous for a nonpublic forum to allow itself to be open to the display of such controversial advertising.

Contrary to AFDI's contention, however, the MBTA's decision to run the Committee for Peace advertisement did not transform the nature of the forum. Ridley involved a challenge to the MBTA's attempt to regulate speech on such controversial topics and issues as religion and the debate over the legalization of marijuana. See id. at 69. In defending those restrictions at that time, the MBTA did not argue that all speech on such topics and issues was per se off limits. See id. at 83. The MBTA instead was quite clear that its Guidelines allowed such speech. See id. And yet, Ridley concluded that the MBTA's willingness to accept advertisements on those hot-button matters did not make the MBTA's advertising program a designated public forum. See id. at 81-82.

It is true, as AFDI argues, that the Supreme Court held in Lehman that an urban transit authority had not created a designated public forum when it limited advertising space on its transit cars "to innocuous and less controversial commercial and service oriented advertising." Lehman v. City of Shaker Heights, 418 U.S. 298, 304 (1974). But Ridley took account of Lehman and concluded that it did not require a nonpublic forum to limit itself to such anodyne messages. See Ridley, 390 F.3d at 78-79. Ridley

-15-

concluded that, for purposes of forum analysis, the MBTA's advertising program was indistinguishable from the program at issue in Lehman, even though the MBTA -- unlike the transit authority at issue in Lehman -- had opened itself up to a wider range of advertisements, including many controversial ones. See id. at 78-82. Ridley thus makes clear that, contrary to AFDI's contention, the MBTA need not reject all but "innocuous and less controversial" advertisements in order to maintain a nonpublic forum.

In so holding, Ridley followed the Supreme Court's instruction that a governmental proprietor creates a designated public forum "only by intentionally opening a nontraditional forum for public discourse." E.g., Cornelius, 473 U.S. at 802. True, a governmental actor's stated intent cannot determine the nature of the forum in the face of countervailing actions by that actor. See Ridley, 390 F.3d at 77. But Ridley explained that the MBTA's expressed intent, as implemented through various restrictions on advertising content, fit with the MBTA's announced purposes in establishing the advertising program as a nonpublic forum -- namely, the MBTA's desire to balance its interest in maximizing revenue from advertising against its interest in ensuring customer satisfaction. See id. at 80. Moreover, Ridley relied on the Supreme Court's observation in Arkansas Education Television Commission v. Forbes, 523 U.S. 666 (1998), that by recognizing the distinction between a government's decision to open its property to

-16-

private messages selectively rather than generally, "we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all."  Ridley, 390 F.3d at 80 (quoting Ark. Educ. Television Comm'n, 523 U.S. at 680).

We are aware that, as AFDI points out, a number of out-of-circuit decisions have held that transit systems' advertising spaces constitute designated public fora.  These cases have done so, moreover, after noting that those transit systems have allowed controversial advertisements.  See, e.g., United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth., 163 F.3d 341, 355 (6th Cir. 1998) (holding that a transit authority had "demonstrated its intent to designate its advertising space a public forum" by accepting a wide array of controversial advertisements in contravention of its policy barring such advertisements); N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 130 (2d Cir. 1998) (suggesting that "deliberate acceptance of the possibility of clashes of opinion and controversy" is inconsistent with operating a nonpublic forum); Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth., 767 F.2d 1225, 1232-33 (7th Cir. 1985) (holding that a transit authority had created a designated public forum where it had accepted a wide range of controversial advertising).

But Ridley controls in this appeal. And Ridley plainly held that a transit agency's decision to allow the display of controversial advertising does not in and of itself establish a designated public forum. Ridley also held that the MBTA had not established such a forum even though the MBTA permitted such advertising. See 390 F.3d at 81-82. Moreover, Ridley reached that conclusion after considering those very same sister circuit cases and concluding that each "is distinguishable on its facts." Id. at 81.

Ridley is not alone in so analyzing the forum issue. The Ninth Circuit recently concluded that the Seattle transit system's paid advertising program was a nonpublic forum. Seattle Mideast Awareness Campaign v. King County, __ F.3d ___, Nos. 11-35914, 11-35931, 2015 WL 1219330, at *6 (9th Cir. Mar. 18, 2015). We agree with the Ninth Circuit that a transit authority, like Seattle's and the MBTA, that allows a wider range of speech than was permitted in Lehman is not automatically stripped of its ability to adopt other viewpoint-neutral criteria for selecting content that reasonably served the agency's overriding commercial purpose. See id. at *6. Like the MBTA's, Seattle's program granted only "selective access" to advertisers, and the selective criteria the agency used to determine which ads could be run were consistently applied. Id. at *5. Further, as here, the advertising program was "part of a government-run commercial enterprise, and the expressive activities

the government permit[ted]" under that program were "only incidental to" the commercial use.  <u>Id.</u>  Thus, the Ninth Circuit concluded -- as do we -- that the bare fact that a transit system runs some controversial ads does not mean that its advertising program becomes a designated public forum.  <u>See</u> <u>id.</u> at *6 ("Any such rule would undermine the [Supreme] Court's efforts to 'encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all.'" (quoting <u>Ark. Educ. Television Comm'n</u>, 523 U.S. at 680)).

That brings us to AFDI's last point on this issue.  AFDI argues that whatever the nature of the MBTA's advertising program in general, when the MBTA accepted an advertisement on the Israeli-Palestinian conflict -- a highly politicized and controversial issue -- the MBTA necessarily established a designated public forum with respect to speech about that particular issue.

But this argument, too, cannot be reconciled with <u>Ridley</u>. There, we "reject[ed] the argument that because a government commercial enterprise has opened up discussion on one particular 'topic' . . . it must allow any and all discussion on that topic." <u>Id.</u> at 91.  <u>Ridley</u> therefore necessarily held that the fact that the MBTA had accepted advertising certain to inspire controversy of one sort or another did not mean that the MBTA runs a designated public forum.  <u>See</u> <u>id.</u>  And nothing in the record before us reveals

-19-

developments that permit us to reach a different conclusion.  Thus, the MBTA's advertising program is a nonpublic forum.  The MBTA may therefore restrict the content of the advertisements it accepts for display so long as such restrictions are not viewpoint-based and are reasonable in light of the purposes for which the forum was established.

**IV.**

According to AFDI, even if the MBTA is operating a nonpublic forum, the MBTA has nonetheless selected a constitutionally impermissible criterion for restricting speech.  And, AFDI maintains, that is true regardless of how the MBTA applied that criterion to AFDI's particular advertisements.  To make that argument, AFDI first claims that the demeaning or disparaging guideline on its face discriminates on the basis of viewpoint.  And, second, AFDI argues that the guideline is so inherently vague that it must be struck down on its face for conferring excessive discretion on the MBTA to select messages it favors and reject ones it dislikes.

These facial attacks, however, like the challenge to the nature of the forum itself, run directly into our decision in Ridley and the law of the circuit doctrine.  Ridley squarely held that exactly the same guideline was not invalid on its face.  See 390 F.3d at 90-91, 93-96.  And Ridley's holding still binds us.

-20-

With respect to viewpoint discrimination, Ridley explained that the demeaning or disparaging guideline is merely a "[r]easonable ground rule[]" under which "all advertisers on all sides of all questions are allowed to positively promote their own perspective and even to criticize other positions so long as they do not use demeaning speech in their attacks." Id. at 91. Thus, we rejected the contention that the demeaning or disparaging guideline is an attempt by the government "to give one group an advantage over another in the marketplace of ideas." Id.; cf. Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 84 (1983) (Stevens, J., concurring in the judgment) (distinguishing between a law that "regulates communications for their ideas" and a law that regulates communications "for their style").

With respect to vagueness, Ridley identified "two basic concerns." Id. at 93. Those concerns were: "1) concerns about fair notice, and about the related danger of chilling expression, and 2) concerns about excessive discretion being invested in administering and enforcing officials." Id.

But Ridley made clear that the MBTA's advertising Guidelines in general raise "no serious concern about either notice or chilling effects" for the simple reason that "there are no consequences for submitting a non-conforming advertisement and having it rejected." Id. at 94. And AFDI offers no basis for concluding that the MBTA implements its policy differently in that

-21-

regard at present.  In fact, AFDI's own experience -- in which it had a second advertisement accepted after its first had been rejected -- would seem inconsistent with that conclusion.

With respect to excessive discretion, <u>Ridley</u> explained that "a grant of discretion to exercise judgment in a non-public forum must be upheld so long as it is 'reasonable in light of the characteristic nature and function' of that forum."  <u>Id.</u> at 95 (quoting <u>Griffin</u> v. <u>Sec'y of Veterans Affairs</u>, 288 F.3d 1309, 1323 (Fed. Cir. 2002)).  <u>Ridley</u> further observed that "selectivity and discretionary access are defining characteristics of non-public fora, which unlike public fora are not intended to be open to all speech."  <u>Id.</u> (internal quotation marks omitted).  And <u>Ridley</u> concluded that the words "demean" and "disparage" are not so unclear that the guideline effectively confers the kind of excessive discretion that might raise concerns about surreptitious viewpoint discrimination or the unreasonable targeting of messages for reasons unrelated to the revenue-generating purposes of the forum.  <u>See</u> <u>id.</u> at 95-96.

That leaves one last wrinkle.  At oral argument, counsel for the MBTA, in response to questioning by the court about hypotheticals, noted that the demeaning or disparaging guideline requires the MBTA to determine what "a reasonably prudent person, knowledgeable of the MBTA's ridership and using prevailing community standards, would believe."  And counsel went even further

and explained, in responding to hypothetical applications, that he believed the MBTA would not apply the demeaning or disparaging guideline to some groups that the community would deem worthy of opprobrium. On that basis, he opined that even though the guideline did not permit the display of the AFDI advertisements under challenge, the MBTA would construe the guideline to permit advertisements using otherwise identical language that targeted a group the MBTA deemed to be held in general disrepute by the public.

At points in its briefs to us, AFDI appears to argue that the MBTA should construe its guideline in that very way. AFDI contends in these passages that its first and third advertisements could not reasonably be understood to be demeaning or disparaging because they merely criticize terrorists. But in its rebuttal at oral argument, AFDI seized on the response to questions by the MBTA's counsel. AFDI argued that the guideline would be suspect if it did not protect certain groups that the MBTA determined were beyond the pale. And AFDI did so with good reason.

If the MBTA counsel's response to hypotheticals about the MBTA's authority were in fact the MBTA's view, and it had acted accordingly, then there would be a substantial argument that the guideline would be suspect under the Supreme Court's opinion in R.A.V. v. City of St. Paul, Minn., 505 U.S. 377 (1992). In R.A.V., the Supreme Court invalidated a municipal ordinance that prohibited

"plac[ing] on public or private property a symbol, object, appellation, characterization or graffiti" amounting to fighting words "on the basis of race, color, creed, religion or gender." Id. at 380-81, 391; see also Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942) (defining fighting words).

Even though fighting words have no "claim upon the First Amendment," the Supreme Court held the ordinance unconstitutional. R.A.V., 505 U.S. at 386, 391. The Court concluded that the ordinance went "beyond mere content discrimination, to actual viewpoint discrimination," and thus violated the First Amendment. Id. at 391. The ordinance did so, the Court explained, because it prohibited only "those symbols that communicate a message of hostility based on" one of the ordinance's enumerated characteristics: "race, color, creed, religion or gender," thereby leaving similarly hostile messages focused on other characteristics unrestricted. Id. at 393.

And while R.A.V. involved a direct restriction on private speech and not the regulation of speech in a nonpublic forum, Ridley noted the potential R.A.V. problem with a demeaning or disparaging guideline that would protect certain groups or individuals but not others, notwithstanding that the MBTA's advertising program was a nonpublic forum. See Ridley, 390 F.3d at 90-91 n.11. Precedent from outside our circuit, moreover, has relied on R.A.V. to invalidate a transit authority's demeaning or

-24-

disparaging advertising guideline that explicitly protected some groups but not others.  See Am. Freedom Def. Initiative v. Metro. Transp. Auth., 880 F. Supp. 2d 456, 474-78 (S.D.N.Y. 2012).

Furthermore, accepting the MBTA's counsel's logic would raise concerns that the guideline was impermissibly vague.  The test for whether speech falls within the guideline's ambit would then no longer be defined only by the meaning of the words "disparaging" and "demeaning."  Instead, the MBTA would have reserved to itself the discretion to decide in each case whether "prevailing community standards" would deem the targeted individual or group worthy of the guideline's protection.  That would raise the concern that the MBTA had reserved to itself discretion to pick and choose between favored and disfavored views.

But we are not bound to accept counsel's guess about how the agency would apply the guideline in hypothetical cases.  And there is no evidence in the record that the MBTA in fact construes the guideline as counsel suggested that it might.  Nor does the text of the guideline compel that hypothetical construction.  We thus decline to attribute such a constitutionally suspect interpretation of the regulation to the MBTA.  See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988) (explaining that, where possible, if "an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to

-25-

avoid such problems"); see also Markadonatos v. Vill. of Woodridge, 760 F.3d 545, 550 (7th Cir. 2014) (noting that "the doctrine of constitutional avoidance functions to minimize friction between courts and legislatures (including state and municipal legislatures)").

We instead conclude, as we did in Ridley, that "[t]he current regulation simply prohibits the use of advertisements that 'demean[] or disparage[] an individual or group of individuals,' without listing any particular protected groups," 390 F.3d at 90-91, and thus without suggesting that any individual or group may be so disparaged or demeaned. Under Ridley, therefore, "the guideline is just a ground rule." Id. at 91. As such, the guideline does not attempt to give one group an advantage over another in the marketplace of ideas. We thus follow our prior holding. The MBTA's guideline prohibiting advertisements containing material that "demeans or disparages" individuals or groups is not invalid on its face.

**V.**

That brings us to the final issue on appeal: the constitutionality of the MBTA's actual application of its demeaning or disparaging guideline to AFDI's ads. For even though the MBTA's advertising platform is a nonpublic forum and the guideline at issue is facially valid, it could still be the case that the MBTA violated the First Amendment if the rejection of AFDI's submissions

were either viewpoint-based or "unreasonable in light of the purpose of the forum."  Id. at 90.

### A.

According to AFDI, the MBTA did engage in viewpoint discrimination in turning down AFDI's first and third advertisements.  AFDI chiefly advances that contention by asserting that the ads the MBTA rejected are no more demeaning or disparaging than the Committee for Peace advertisement (which the MBTA ran).  AFDI argues that its rejected submissions differ from the Committee for Peace advertisement only in the side of the Israeli-Palestinian conflict that they favor.  And thus, AFDI contends, viewpoint discrimination necessarily explains the MBTA's different treatment of those ads.

But the record shows otherwise.  The MBTA determined that the text of AFDI's first and third ads did use language that assigned a demeaning or disparaging label to an individual or group.  But the MBTA also determined that the text of the Committee for Peace advertisement -- which used no such directly targeted, negative language at all -- did not.  And Ridley supports the conclusion that the MBTA's reliance on such a linguistic distinction does not constitute viewpoint discrimination.

In Ridley, we considered the MBTA's treatment of three advertisements submitted by a representative of the Church with the Good News, a religious group.  See 390 F.3d at 73-75.  The MBTA

accepted the first two.  Id. at 73-74.  The MBTA found that the third, however, violated the demeaning or disparaging guideline. Id. at 74-75.  The MBTA's reason for its decision was similar to the reason the MBTA relies on here.  See id.

The religious group's first advertisement, which the MBTA accepted, read as follows:

> Christians in the Bible never observed 'Christmas' neither did they believe in lies about Santa Claus, flying reindeer elves and drunken parties.  How can you honor Jesus with lies?  prophet-andre.com.

Id. at 73.

Good News then made a second submission.  The MBTA initially rejected it, but then ultimately accepted after promulgating new guidelines.  Id. at 74.  This second advertisement stated:

> The Bible says in Rev 12:9 'And Satan which deceiveth the whole world.'  Yes, Satan set up over a thousand false religions in the world causing wars, racism and hatred in the world.  There is only one true religion.  All the rest are false.  www.prophet-andre.com."

Id.

Good News then submitted a final advertisement.  Id.  The MBTA ultimately rejected this one.  Id. at 74-75.  That final advertisement read as follows:

> The Bible teaches that there is only one religion.  There are no scriptures in the Bible that teach that God set up the Catholic religion, the Baptist religion, the Pentecostal religion, the Jehovah's Witness religion or the Muslim religion.  These religions are false.  The Bible says in Revelation 9:12, 'And Satan, which deceiveth the whole world.'  The whole world is going to

-28-

> hell if they do not turn from their ungodly ways.  God
> sent Prophet Andre into this world to teach the people
> the Truth.  www.prophetandre.com.

Id.

We upheld the MBTA's rejection of the third advertisement against a charge of viewpoint discrimination.  See id. at 92.  We explained that the MBTA had not based its judgment to refuse to run this ad -- and to agree to run the others -- on a preference for one view over another.  See id.  Instead, we concluded that the MBTA based its decision on the relative directness and harshness of the hostile characterizations with which the respective submissions targeted individuals or groups.  See id.

The first advertisement merely "questioned the waywardness of today's Christians," and the second "issued a condemnation of other religions" generally.  Id.  But the third submission, we explained, "went a vitriolic further step."  Id. Specifically, the third Good News advertisement "directly demeaned a number of religions" -- many of which "are likely to be the shared religions of a number of the MBTA riders" -- "by calling them false" and, more pointedly, telling their respective adherents that "they are 'going to hell.'"  Id.

Here, too, the MBTA concluded that the AFDI's first and third ads went a "vitriolic further step."  Neither advertisement goes quite so far as the last Good News submission in calling out its intended targets by name.  But both of AFDI's rejected versions

-29-

do plainly equate with "the savage" those who are Israel's enemy in "war" and who practice "jihad" or "violent jihad." In that respect, AFDI's rejected advertisements are more targeted than either of the two accepted Good News ads. And, of course, to describe an opponent as not only uncivilized but savage is to disparage or demean that opponent in terms not unlike those used in the third Good News ad. See Oxford English Dictionary (3d ed. 2012) (defining the term "savage" as meaning, among other things, "[a] person living in a wild state; a member of a people regarded as primitive and uncivilized" and "a cruel and brutal person"); American Heritage Dictionary of the English Language (5th ed. 2014) (defining "savage" as "a member of a people regarded as primitive, uncivilized, brutal, or fierce").

AFDI responds as follows. It notes that numerous legal definitions of the Committee for Peace advertisement's operative term -- "refugee" -- require that one either have been or will be persecuted in order to fall within its ambit. See, e.g., 8 U.S.C. § 1101(a)(42) (defining "refugee" as one who is unable to return to one's national homeland "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion"); United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137, 152 (similar). AFDI argues that this advertisement thus in effect labels Israel a persecutor. And for

that reason, AFDI argues, this advertisement is as disparaging or demeaning as AFDI's rejected submissions.

But the Committee for Peace advertisement, in calling Palestinians "refugees," does not label anyone as a persecutor. Neither the word "persecutor" nor any reasonably synonymous hostile label is used at all. And the fact that the advertisement calls Palestinians "refugees" -- however offensive or inaccurate a supporter of Israel might find the use of that label -- does not change that simple fact. Thus, the MBTA has identified a distinction that is unrelated to the viewpoint the ads express and instead relates directly to the guideline's purpose: to screen out content that is demeaning or disparaging.

Consistent with the conclusion that this linguistic focus is not viewpoint based, we note that the MBTA did accept the second AFDI advertisement. The MBTA did so even though that second AFDI ad, like AFDI's first and third ones, plainly conveyed a viewpoint distinct from the one that is conveyed by the Committee for Peace advertisement. And the MBTA did so because it determined, on the basis of the language used rather than the view advanced, that the second AFDI advertisement lacked the demeaning or disparaging language that the guideline prohibits. For although the second AFDI advertisement is no doubt critical of certain persons or groups, it used the epithet "savage" only to characterize the nature of certain acts, not to describe the perpetrators of those

acts.  That is, the second AFDI advertisement, though critical, did not directly denigrate anyone.

In this respect, the MBTA consistently applied the guideline in each of these cases.  The MBTA focused each time on the directness of the hostile language used to describe groups or individuals.  And the MBTA maintained that focus in applying the guideline both to messages offered in support of Israel and to one advanced to promote the Palestinian cause.  Such consistent application is at odds with the contention that the MBTA engaged in viewpoint discrimination.[5]  See Ridley, 390 F.3d at 82 ("The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses."); see also McGuire v. Reilly, 386 F.3d 45, 62 (1st Cir. 2004) ("The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another.").

---

[5] We note in this regard that the MBTA accepted not only AFDI's second version of its ad, but also an advertisement from a "pro-Israel" organization called "StandWithUs.com" that purports to directly rebut the Committee for Peace advertisement.  The Stand With Us advertisement contains three maps of the Middle East, the first depicting "3000 years ago," the second 1920, and the third "today."  The maps visually contrast the sizes of, on the one hand, the "Ancient Jewish Kingdom" of 3000 years ago and the "Jewish Homeland" of 1920 with, on the other, the "State of Israel," the latter of which is depicted as being far smaller than either of the former.

AFDI does argue that its second advertisement is not nearly as effective at conveying AFDI's message as the two rejected advertisements would have been. And that may well be true. But as we have explained, there is no evidence that the MBTA barred AFDI's first and third advertisements because of the viewpoint they expressed. Thus, the fact that the application of the demeaning or disparaging guideline prevented AFDI from putting forth its message through a more effective means does not show that the MBTA wished to disfavor AFDI's point of view. That consequence is merely an incidental effect of the MBTA's application of the general ground rule against the use of demeaning or disparaging language to individual or groups. And because, as <u>Ridley</u> held, that ground rule does not itself favor any particular viewpoint, neither does its neutral application. <u>See</u> <u>Ridley</u>, 390 F.3d at 82 ("The essence of viewpoint discrimination is not that the government incidentally prevents certain viewpoints from being heard in the course of suppressing certain general topics of speech, rather, it is a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic.").

For these reasons, we conclude that, although the MBTA accepted the Committee for Peace advertisement, the MBTA did not engage in viewpoint discrimination in rejecting AFDI's first and third submissions.

-33-

That leaves one last issue.  AFDI argues that the MBTA failed to apply the demeaning or disparaging guideline in a way that is "reasonable in light of the purpose served by the forum." Id. at 93 (quoting Cornelius, 473 U.S. at 806).  That is because, AFDI contends, the distinctions the MBTA drew between AFDI's advertisements -- which, AFDI says, turned simply on whether the term "savage" was used as a noun or an adjective -- do not reasonably advance any purpose that the MBTA's guideline may legitimately serve.

To support that argument, AFDI once again focuses (at least in part) on the Committee for Peace advertisement.  AFDI points out that even though that ad provoked strongly negative reactions from many members of the public, the MBTA still permitted the ad to run.  By contrast, AFDI argues, the MBTA rejected the first and third AFDI ads.  The MBTA did so, AFDI argues, on the basis of unreasonable speculation -- namely, that the shift from the use of "savage" as an adjective in AFDI's second ad to the use of "savage" as a noun in the first and third versions would provoke concern among the MBTA's customers.  AFDI contends that noun/adjective distinction is "patently unreasonable" given that the MBTA's stated rationale for the demeaning or disparaging guideline relates to the interest in promoting ridership.  In AFDI's view, it is simply not reasonable to believe that riders

-34-

would be more likely to be troubled by the message conveyed by the two rejected AFDI ads than by either the accepted AFDI ad or the Committee for Peace ad.

In evaluating that argument, we start with the fact that Ridley held that the disparaging or demeaning guideline does reasonably serve the purposes of the transit authority in establishing the nonpublic forum. Id. at 93. The guideline does so, Ridley explained, because a transit authority may reasonably conclude that disparaging or demeaning advertisements are especially incompatible with the mission of operating buses, trains, and transit stations for the benefit of the public. Id. The harshness and targeted nature of ads containing such language makes them different -- and, at least one could reasonably conclude, more concerning -- than other ads. And that includes ads that do not contain such language but may themselves provoke intense disagreement or even cause offense. See id. at 92-93.

Thus, the question we must focus on in conducting our reasonableness review is relatively narrow. We must determine whether the MBTA acted reasonably in concluding that the rejected advertisements (and not the accepted ones) fall within that especially denominated category of prohibited advertisements -- a category, we emphasize, that cuts across all advertisements, no matter the viewpoint they express.

In evaluating the reasonableness of the MBTA's decision that AFDI's first and third submissions fall within that prohibited category (and that AFDI's second version and the Committee for Peace ad do not), we are mindful that "there can be more than one reasonable decision, and an action need not be the most reasonable decision possible in order to be reasonable." Id. at 90. And given this relatively generous standard, we conclude that, although the issue is close, the MBTA has reasonably applied the guideline in a manner that advances its purpose.

In rejecting AFDI's as-applied viewpoint discrimination challenge, we explained why the Committee for Peace ad differs from the first and third AFDI ads along the dimension that the guideline makes relevant. The Committee for Peace ad makes no use of language that directly ascribes a hostile characterization to anyone. Its criticism is implicit and indirect, even if some might infer that the hostile term "persecutor" was intended. By contrast, AFDI's first and third advertisements, by using the word "savage" to describe certain of Israel's enemies, went "a vitriolic further step." See id. at 93. Thus, the MBTA could reasonably conclude that the first and third ads were disparaging and demeaning while the Committee for Peace ad was not.

That same distinction also explains why the MBTA could reasonably distinguish the use of "savage" in the first and third AFDI ads from the use of "savage" in the second AFDI ad. That

-36-

second ad simply did not use the directly disparaging or demeaning noun "savage" to describe one side of a debate. The two rejected ads, by contrast, did. Those ads used the word "savage" to describe not just certain types of actions, as the second AFDI ad did in describing certain acts as "savage." Those ads instead used the word "savage" to characterize the nature of those who are responsible for those acts -- namely those engaged in a war against Israel.

And while neither of AFDI's rejected submissions directly states that those with whom Israel is at "war" are "savages," we cannot say the ads' subtlety in that one regard makes the MBTA's decision to reject them unreasonable. In context, the target of the opprobrium was focused. The ads aimed at those who practice jihad or violent jihad in the "war" against Israel, a focus that reasonably led the MBTA to identify the ads as targeted at that country's Muslim and Palestinian enemies in particular. By contrast, the Committee for Peace ad did not use any direct, vitriolic descriptor, while the second AFDI ad used one only to describe acts and not any individual or group. Thus, just as we found in Ridley that the MBTA could reasonably discern material distinctions among the three Good News ads in the stridency and targeted nature of the language used, see id. at 92-93, so, too, here.

Whether these linguistic and grammatical distinctions reflect distinctions in substance that would be meaningful to the public is, of course, hard to know. Nor is it clear that these distinctions actually reflect differences in the messages that the advertisements' sponsors intended to communicate. Nor is it even clear that the MBTA has properly identified the intended object of the harsh language AFDI used in the rejected ads.

But an administrative rule of this sort is, in application, sure to present close cases about its parameters. And such a rule is sure as well to require in some cases some careful parsing of the language and meaning of the speech the rule restricts. Our review, however, is only for reasonableness. We thus decline AFDI's invitation, in such a borderline case, to undertake such review in a manner that would effectively transfer to the federal judiciary the detailed and case-specific application of a facially constitutional public transit authority advertising guideline. We are especially disinclined to do so when reviewing a denial of a preliminary injunction, given that AFDI may still press its constitutional challenge on a more developed record. Cf. Syndicato Puertoriqueño, 699 F.3d at 10 (plaintiffs seeking preliminary injunction must "establish a 'strong likelihood' that they will ultimately prevail" on the merits (quoting Respect Me. PAC, 622 F.3d at 15)).

We thus conclude that the application of the guideline to the advertisements at issue here was not just viewpoint neutral. We also conclude that the application of the guideline was reasonable in light of the valid purposes Ridley held that the guideline serves.[6]

**VI.**

For the foregoing reasons, the judgments of the District Court in MBTA I and MBTA II are **affirmed**.

**-Opinion Concurring In Part And Dissenting In Part Follows-**

---

[6] We note that the District Court's main reason for denying preliminary injunctive relief as to AFDI's third ad was that AFDI had supposedly acted in bad faith and engaged in gamesmanship by altering the second advertisement and then submitting the third version. We need not resolve whether this ground for denying the requested relief was permissible, because we affirm the District Court on other grounds. But we do note that the MBTA had established a mechanism for the submission of revised advertisements that had been previously rejected. In submitting the third advertisement, therefore, AFDI was using that process to probe the parameters of the government's speech restriction in order to vindicate its interest in running the most effective advertisement possible. And, in response, the MBTA did not conclude that AFDI had forfeited its right to receive further guidance. Instead, the MBTA applied the guideline once again.

**STAHL, Circuit Judge, concurring in part and dissenting in part.** I concur in part because I recognize that Ridley v. Massachusetts Bay Transportation Authority, 390 F.3d 65 (1st Cir. 2004), controls Parts III and IV of the majority's analysis. I respect that the law of the circuit doctrine dictates the outcome of the forum question and the facial validity of the guideline at issue. I write separately to express my opinion that Ridley was wrongly decided. By opening up its advertising facilities to controversial topics of the gravest political issues of our day, the MBTA has created a designated public forum for speech, not a nonpublic forum. I dissent from Part V of the majority opinion because even under the more forgiving standard mandated by Ridley, the MBTA engaged in viewpoint discrimination and acted unreasonably when it rejected AFDI's third advertisement.

It goes without saying that discussions of the Israeli-Palestinian conflict and Israel's role in the Middle East have become ever more contentious, heated, and often vitriolic. In enacting the Bill of Rights, the framers recognized that vigorous debate on matters of public concern was necessary and desirable in a functioning Republic. The First Amendment not only protects each speaker's ability to offer his or her perspective on fractious issues without fear of government muzzling, but affirmatively encourages such robust argument in the public sphere. E.g., Red Lion Broad. Co. v. F.C.C., 395 U.S. 367, 390 (1969) ("It is the

-40-

purpose of the First Amendment to preserve an uninhibited marketplace of ideas . . . rather than to countenance monopolization of that market . . . ."). Indeed, "[s]peech on matters of public concern . . . is at the heart of the First Amendment's protection." Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011) (internal quotation marks and citations omitted).

Thus, from the beginning, the government has been limited in its ability to restrict speech in traditional public fora such as sidewalks and parks, which serve a role as "sites for discussion and debate" and "venues for the exchange of ideas." McCullen v. Coakley, 134 S. Ct. 2518, 2529 (2014). That said, the First Amendment does not require governmental entities to allow all matter and manner of speech on government-owned property. E.g., Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992). For example, in Lehman v. City of Shaker Heights, a plurality of the Supreme Court concluded that a public transit system which opened itself up to commercial advertisements had created a nonpublic forum in which it could choose not to accept a political candidate's campaign advertising. 418 U.S. 298, 304 (1974). Lehman noted that the Shaker Heights transit system's advertising policy explicitly forbade "political advertising." Id. at 299. The system consistently enforced that policy: in twenty-six years of operation, the transit system had accepted commercial advertising, advertising from churches, and advertising from "civic

and public-service oriented groups," but had never "accepted or permitted any political or public issue advertising." Id. at 300-01.

Following Lehman, some of our sister circuits have deemed public transit advertising facilities nonpublic fora where the transit authority's policy limits advertising facilities to commercial speech, and/or the authority had consistently rejected non-commercial submissions that addressed political or civic issues. Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART), 698 F.3d 885, 890-92 (6th Cir. 2012) (finding that Michigan public bus system established a nonpublic forum where SMART's written policy "banned political advertisements, speech that is the hallmark of a public forum" and "restrict[ed] the type of content that nonpolitical advertisers [could] display"); Children of the Rosary v. City of Phoenix, 154 F.3d 972, 978 (9th Cir. 1998) (White, J.) (finding a nonpublic forum where the city "consistently promulgate[d] and enforce[d] policies restricting advertising on its buses to commercial advertising"); Lebron v. Nat'l R.R. Passenger Corp. (Amtrak), 69 F.3d 650, 656 (2d Cir. 1995) (holding that a large billboard in New York City's Pennsylvania Station constituted a nonpublic forum where Amtrak had "never opened [the advertising facility] for anything except purely commercial advertising").

By contrast, other circuits have considered controversial advertisements in the context of public transportation systems and rightly concluded that when public transit facilities open themselves up to a variety of non-commercial speech, those facilities become designated public fora for members of the public to opine, discuss, and comment upon the civic and political issues of the day. United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth., 163 F.3d 341, 355 (6th Cir. 1998); Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth., 148 F.3d 242, 252 (3d Cir. 1998); N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 130 (2d Cir. 1998); Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth., 767 F.2d 1225, 1232-33 (7th Cir. 1985); Lebron v. Wash. Metro. Area Transit Auth., 749 F.2d 893, 896 (D.C. Cir. 1984); see also DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 966 (9th Cir. 1999) (observing that "where the government historically has accepted a wide variety of advertising on commercial and non-commercial subjects, courts have found that advertising programs on public property were public fora"). Thus, in United Food, a Sixth Circuit case, the state agency operating transit service in Cincinnati (known by the acronym SORTA) sold advertising space on its buses and bus shelters. 163 F.3d at 346. The agency's advertising policy explicitly excluded submissions with "controversial public issues that may adversely affect SORTA's ability to attract and maintain ridership" and required all posted

advertisements to be "aesthetically pleasing." Id. SORTA accepted "a wide variety of advertisements . . . including public-service, public-issue, and political advertisements in addition to traditional commercial advertisements," id., but rejected the plaintiff's pro-union advertisement as "aesthetically unpleasant and controversial" in violation of the policy, id. at 347. While acknowledging that SORTA had consistently applied its policy in the past, id. at 353, the Sixth Circuit held that SORTA nevertheless had designated its advertising space a public forum by "accepting a wide array of political and public-issue speech," id. at 355. "Acceptance of political and public issue advertisements, which by their very nature generate conflict, signals a willingness on the part of the government to open the property to controversial speech, which the [Supreme Court] in Lehman recognized as inconsistent with operating the property solely as a commercial venue." Id. (citing Lehman, 418 U.S. at 303-04). The Second Circuit similarly observed in New York Magazine, "[a]llowing political speech . . . evidences a general intent to open a space for discourse, and a deliberate acceptance of the possibility of clashes of opinion and controversy that the Court in Lehman recognized as inconsistent with sound commercial practice." 136 F.3d at 130; see also Planned Parenthood Ass'n/Chi. Area, 767 F.2d at 1233 (holding that Chicago transit advertising facilities was a public forum and noting that where defendant "has accepted

political and public-issue advertising. . . . <u>Lehman</u> is not controlling"); <u>but see</u> <u>Seattle Mideast Awareness Campaign</u> v. <u>King County</u> ("<u>SeaMAC</u>"), ___ F.3d ___, Nos. 11-35914, 11-35931, 2015 WL 1219330, at *6 (9th Cir. Mar. 18, 2015) (holding, over dissent, that bus advertising program created a limited public forum even where it accepted political speech).

The majority opines that <u>Ridley</u> had the opportunity to consider almost all of these cases and ultimately chose to conclude that each was "distinguishable on its facts." <u>Ridley</u>, 390 F.3d at 80. <u>Ridley</u> also proclaimed that the MBTA's advertising program was "indistinguishable" from the one described in <u>Lehman</u>, <u>id.</u> at 78, apparently ignoring the fact that the Shaker Heights advertising program in <u>Lehman</u> had never accepted any political or public issue advertising, 418 U.S. at 300–01; <u>see also</u> <u>Lehman</u> v. <u>City of Shaker Heights</u>, 296 N.E.2d 683, 684 (Ohio 1973) (noting that the city "has not opened up its transit vehicles to any exchange or presentation of ideas, political or otherwise").

I am in disagreement with the <u>Ridley</u> decision, and would have held that the MBTA, by opening its advertising facilities to all forms of public discourse, created a designated public forum akin to the fora discussed in <u>United Food</u>, <u>Christ's Bride</u>, <u>New York Magazine</u>, and <u>Planned Parenthood Association/Chicago Area</u>, and distinguishable from the virtually commercial-only fora addressed in <u>Lehman</u>, <u>Children of the Rosary</u>, and <u>Lebron</u> v. <u>Amtrak</u>. Instead,

relying on the MBTA's self-serving declarations, Ridley concluded that the authority's policy evidenced an intent "not to open its advertising space to all persons and organizations for public dissemination of their views on all topics without limitation" and that its enforcement of the guidelines "further show[ed] that it intended not to create such a forum." 390 F.3d at 78.

In order to create a designated public forum, the governmental entity need not accept every speaker and all topics. Indeed, a forum can become public where the government by its actions has designated the forum "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects" in order to "open [the non-traditional public forum] to assembly and debate." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802 (1985) (emphasis added); see also Int'l Soc'y for Krishna Consciousness, 505 U.S. at 678 (describing a designated public forum, "whether of a limited or unlimited character," as "property that the State has opened up for expressive activity by part or all of the public").

An agency or governmental entity, like the MBTA, may create a designated public forum even where it does not allow certain categories of speech to participate in its advertising program, such as advertisements for mature video games or alcoholic products. Cf. N.Y. Magazine, 136 F.3d at 129-30. A guidelines' ban on political campaign ads does not make the advertising

facilities a nonpublic forum if the governmental entity affirmatively opens up its facilities to advertisements concerning civic or political issues unrelated to a particular campaign season. Here, as the Ridley dissent cogently noted, the MBTA made and continues to make its facilities the "modern analogue" to traditional public fora. Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 108 (1st Cir. 2004) (Torruella, J., concurring in part and dissenting in part). Indeed, the Committee for Peace submitted its advertisement to the transit authority because the availability of advertising in a system used by millions of people each day provides a singular opportunity to sway public opinion about the Israeli-Palestinian conflict. See id. at 109 ("The MBTA's advertising system is indeed a powerful tool with which to influence public opinion, one which should be opened to the crucible of competing viewpoints to the largest extent possible.").

The Ridley dissent highlights a weakness in the current forum analysis framework, in that it can allow the government's own self-serving statements about its intended use for a public place to outweigh the forum's inherent attributes. As Justice Kennedy has observed in the past, if "public forum jurisprudence is to retain vitality, we must recognize that certain objective characteristics of Government property and its customary use by the public may control the case." United States v. Kokinda, 497 U.S. 720, 737-38 (1990) (Kennedy, J., concurring in the judgment). By

-47-

relying primarily on "the government's defined purpose for the property" rather than on "the actual, physical characteristics and uses of the property," the mode of forum analysis embraced in Ridley "leaves the government with almost unlimited authority to restrict speech on its property by doing nothing more than articulating a nonspeech-related purpose for the area." Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 695 (1992) (Kennedy, J., concurring in the judgments). Building a constitutional framework around a category as rigid as "traditional public forum" leaves courts ill-equipped to protect First Amendment expression "in times of fast-changing technology and increasing insularity." Id. at 697-98 (observing that "our failure to recognize the possibility that new types of government property may be appropriate forums for speech will lead to a serious curtailment of our expressive activity").

Ridley exemplifies Justice Kennedy's concerns, in that its analysis relied heavily on the MBTA's attempts to control speech on its property through its advertising guidelines, 390 F.3d at 76-82, but only cursorily examined the forum's characteristics and compatibility with expressive activity, id. at 77. By doing so, the Ridley majority ignored the indisputable fact that, like an airport, a public transit system is "one of the few government-owned spaces where many persons have extensive contact with other members of the public." Int'l Soc'y for Krishna

-48-

Consciousness, 505 U.S. at 698 (Kennedy, J., concurring in the judgments). Such unique suitability for open discourse between citizens is indicative of a public, rather than a private, forum. Cf. McCullen, 134 S. Ct. at 2529 (observing that public streets "remain one of the few places where a speaker can be confident that he is not simply preaching to the choir" because members of the public cannot avoid "uncomfortable message[s]," which the First Amendment regards as "a virtue, not a vice").

Nevertheless, recognizing that Ridley controls the forum analysis in this appeal, I concur with Part III of the majority's opinion. Bound by the law of the circuit, I also join Part IV of the majority's opinion, acknowledging that the "demeaning and disparaging" guideline at issue here contains the same language as the guideline deemed facially valid by Ridley, even though I agree with the Ridley dissent that the guideline and its invocation of "prevailing community standards" permits "subjective, ad hoc determinations about speech that appears controversial because it endorses a minority viewpoint." Ridley, 390 at 98 (Torruella, J., concurring in part and dissenting in part); cf. SeaMAC, 2015 WL 1219330, at *8 (observing that a transit authority's exclusion of advertisements it deems "objectionable under contemporary community standards," standing alone, "would be too vague and subjective to be constitutionally applied"); Planned Parenthood Ass'n/Chi. Area, 767 F.2d at 1230 (questioning whether "a regulation of speech that

has as its touchstone a government official's subjective view that the speech is 'controversial' could ever pass constitutional muster").

But I depart with the majority opinion at Part V, because even if the advertising facilities at issue constituted a nonpublic forum, the MBTA's rejection of Advertisement III was neither viewpoint neutral nor reasonable. In particular, I disagree with the majority that the Committee for Peace advertisement "does not label anyone as a persecutor." To the contrary, the advertisement all but declares that the Israeli nation-state is the persecuting entity responsible for the supposed Palestinian refugee crisis. The ad depicts four maps, labeled "Palestinian Loss of Land -- 1946 to 2010." The first map, captioned "1946," depicts part of the region then controlled by the British under the British Mandate for Palestine, labeling that area "Palestine." The next three maps place the word "Israel" in the same font and in the same place as "Palestine" is located in the first map. Over the course of the next three maps, the amount of land labeled "Israel" increases as the green section -- denoted in the key as representing "Palestinian land" -- shrinks. If Israel, and by extension the Jewish people, are not fingered as persecutors by the ad, who, exactly, is the ad targeting as responsible for displacing 4.7 million Palestinians? While the majority brushes off the criticism as merely "implicit and indirect," a reasonable rider of the MBTA

would find the message quite clear: Israelis took over Palestinian land, thereby displacing Palestinians and creating a refugee crisis in the millions.  The characterization is not only inaccurate[7] but arguably demeaning and disparaging of the Israeli people in violation of the MBTA's own guideline.  While Committee for Peace might not use the term "persecutor," it is a short inferential step to reach that interpretation, in the same way that the viewer of AFDI's first submitted advertisement must juxtapose "civilized man" and "savage," and then infer from AFDI's call to "support Israel" and "defeat jihad" that the ad is setting up Israel as the civilized man, and the jihadist as the savage.  The reader must take an additional inferential leap to conclude, as the MBTA does, that "savage" refers not just to jihadis but to Muslims generally.  By accepting the Committee for Peace advertisement but not AFDI's

---

[7] I note that this number is inaccurate and misleading.  The United Nations Relief and Works Agency for Palestinian Refugees in the Near East (UNRWA) estimates that there were 750,000 individuals designated as refugees in 1950 as a result of the conflict between 1946 and 1948.  The 4.7 million number and similar estimates denote the descendants of these refugees who are currently eligible to register for UNRWA services. See *Palestine Refugees*, UNITED NATIONS RELIEF & WORKS AGENCY FOR PALESTINIAN REFUGEES IN THE NEAR EAST, http://www.unrwa.org/palestine-refugees, (last visited Mar. 24, 2015) (estimating that "[t]oday, some 5 million Palestine refugees are eligible for UNRWA services"); UNITED NATIONS RELIEF & WORKS AGENCY FOR PALESTINIAN REFUGEES IN THE NEAR EAST, CONSOLIDATED ELIGIBILITY AND REGISTRATION INSTRUCTIONS, at 3, available at http://unispal.un.org/pdfs/UNRWA-CERi.pdf (last visited Mar. 24, 2015) (setting out criteria for eligibility to register).  A rider of the MBTA viewing the Committee for Peace Ad may come away with the erroneous impression that the proclamation of the nation-state of Israel in 1948 displaced 4.7 million people.

submission, the MBTA allowed its riders access to one perspective on the Israeli-Palestinian conflict, while denying them exposure to AFDI's perspective.[8] In contrast, the Ninth Circuit recently found no evidence of viewpoint discrimination where Seattle's transit program withdrew acceptance of an anti-Israel bus poster "as part of a single, blanket decision to reject all submitted ads on the

---

[8] Notably, multiple district courts have awarded preliminary injunctive relief in similar factual circumstances, albeit under the strict scrutiny standard dictated by finding that a transit advertising program constitutes a designated public forum. Two of these cases involved the exact AFDI ad at issue here. Am. Freedom Def. Initiative v. Wash. Metro. Area Trans. Auth., 898 F. Supp. 2d 73, 83 (D.D.C. 2012) (finding a likelihood of success on the merits where WMATA failed to use the least restrictive means of assuring public safety, which might be threatened by displaying AFDI's "support the civilized man" ad in the subway system); Am. Freedom Def. Initiative v. Metro. Transp. Auth., 880 F. Supp. 2d 456, 476–77 (S.D.N.Y. 2012) (finding the MTA's guideline barring advertisements deemed "demeaning on the basis of . . . religion" -- used to justify rejection of AFDI's "civilized man" submission -- inconsistent with the First Amendment). The Eastern District of Michigan rejected a city's refusal to accept an anti-Israel ad it deemed violative of the transit authority's guideline that all advertisements be "in good taste" and not "defame[] or . . . hold up to scorn or ridicule a person or group of persons." Coleman v. Ann Arbor Transp. Auth., 904 F. Supp. 2d 670, 697 (E.D. Mich. 2012). Most recently, the Eastern District of Pennsylvania granted AFDI's motion for a preliminary injunction compelling display of an advertisement demanding an end to "all [U.S.] aid to Islamic countries" under the slogan "Islamic Jew-Hatred: It's in the Quran" and next to a picture of Adolf Hitler and "his staunchest ally, the leader of the Muslim world, Haj Amin Al-Husseini." Am. Freedom Def. Initiative ("AFDI") v. Se. Pa. Transp. Auth. ("SEPTA"), -- F. Supp. 3d --, 2015 WL 1065391, at *1 (E.D. Pa. Mar. 11, 2015). The court concluded that SEPTA's "anti-disparagement" guideline was a content-based and viewpoint discriminatory restriction on speech. Id. at *9–10. While noting that the guideline "was a principled attempt to limit hurtful, disparaging advertisements," the district court rightly concluded that such "laudable . . . aspirations do not, unfortunately, cure First Amendment violations." Id. at *12.

Israeli-Palestinian conflict." SeaMAC, 2015 WL 1219330, at *10. The Seattle authority's advertising policy prohibited advertising which "may foreseeably result in harm to, disruption of, or interference with the transportation system." Id. at *9. Noting that the transit system had received numerous credible threats in response to a news report that it had approved an ad criticizing "Israeli War Crimes," the Ninth Circuit concluded that the system reasonably applied its policy by "simultaneously reject[ing] all pending ads on the Israeli-Palestinian conflict" due to the "threat of disruption posed to the transit system" and rider safety. Id. The system then "revised its advertising policy to exclude all political or ideological ads from that point forward." Id. at *3.

In contrast, the MBTA's incongruous decision to post the Committee for Peace ad, but reject AFDI's submissions, at the very least, raises the specter of viewpoint discrimination by the MBTA. As we have said in the past, "grave damage is done if the government, in regulating access to public property, even appears to be discriminating in an unconstitutional fashion." AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth., 42 F.3d 1, 12 (1st Cir. 1994). Admittedly, the MBTA here offers its "demeaning and disparaging" policy as a neutral justification for the difference in treatment -- something it could not do in AIDS Action. But even a neutral policy, if it creates "opportunities for discrimination

-53-

. . . [that] have been borne out in practice," id., cannot survive under the First Amendment.

Furthermore, even if one accepts the majority's conclusion in Part V.A that the MBTA applied its prohibition on demeaning and disparaging advertisements in a viewpoint-neutral manner, I would reverse because the MBTA acted unreasonably in rejecting the third AFDI ad. This advertisement differed from the first advertisement in that it narrowed the scope of the condemned practice from "jihad" (a term which could refer broadly to an individual Muslim's internal spiritual struggle) to "violent jihad" (a phrase which can only be read to refer to terrorist practices roundly denounced as extremist by both Muslims and non-Muslims). This change clarified that the ad denounced not all adherents of jihad as "savages," but instead proponents of violent jihad.

The district court found that the "most reasonable interpretation" of AFDI's first ad, which referred to jihad generally, was that AFDI "oppose[s] acts of Islamic terrorism directed at Israel," but concluded that it was nevertheless "plausible for the [MBTA] to conclude that [AFDI's first ad] demeans or disparages Muslims or Palestinians." Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth., 989 F. Supp. 2d 182, 188–89 (D. Mass. 2013). I acknowledge that "an action need not be the most reasonable decision possible in order to be reasonable," Ridley, 390 F.3d at 90, and thus agree with the district court and

the majority that the MBTA's denial of the first ad could be construed as reasonable and thus pass muster in a nonpublic forum.

Not so with the third advertisement, which explicitly advocates for the defeat of "violent jihad," and not "jihad" in general. The only reasonable reading of "savage" in the context of defeating "violent jihad" is a reference to a category of individuals engaged in an extremist campaign characterized by bloodshed and terror. The MBTA's acceptance of the second ad, which juxtaposed the civilized man with "those engaged in savage acts," demonstrates that the transit authority does not find it demeaning or disparaging to decry an individual's violent actions. Why then is it demeaning to describe that same individual, engaged in savage acts with violence as his goal, as a savage? The First Amendment protects and encourages full-throated debate, not only sanitized and diluted discussion.[9]

Perhaps the logical end to the MBTA's "demeaning or disparaging" guideline is to forbid condemnation of any individual

---

[9] The majority does not reach the merits of the district court's finding that AFDI submitted the third ad in bad faith. See Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth., No. 1:14-cv-10292-NMG, 2014 WL 1093138, at *3 (D. Mass. Mar. 17, 2014). However, the majority rightly notes that AFDI's submission of the third ad after the MBTA's acceptance of its second ad merely indicated AFDI's desire to "probe the parameters of the government's speech restriction in order to vindicate its interest in running the most effective advertisement possible." Ante, at 39 n.6. For those reasons, I would hold that the district court's bad faith finding amounts to clear error, and thus does not bar equitable relief where AFDI demonstrated a likelihood of success on the merits of its First Amendment claim.

or group, even if that individual or group's actions are generally regarded as worthy of denouncement. But at oral argument, MBTA's counsel stated that the guideline would not prohibit the posting of an advertisement maligning an individual that society commonly accepts as worthy of denigration, such as Adolf Hitler. Such an answer betrays the unreasonableness and viewpoint-based nature of the decision here.

As the Supreme Court has repeatedly emphasized,

> the fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection. For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas.

F.C.C. v. Pacifica Found., 438 U.S. 726, 745-46 (1978). This central tenet may appear to lead to "verbal tumult, discord, and even offensive utterance," but if "the air may at times seem filled with verbal cacophony[, that] is . . . not a sign of weakness but a strength." Cohen v. California, 403 U.S. 15, 25 (1971).

The MBTA seeks to maximize the financial returns it can receive from the use of its facilities for advertising. Having accepted virtually all advertisements with an eye toward filling its coffers, the MBTA's attempt to then limit submitted speech which some officials deem unacceptable is violative of the First Amendment. For the reasons stated above, I concur with Parts III

and IV of the majority's analysis, and respectfully dissent from Part V.



Committee for Peace ad



AFDI's first submission



AFDI's second submission



AFDI's third submission



StandWithUs.com ad